## HOYT v. SPRAGUE.

### FRANCKLYN v. SPRAGUE.

1. If the executor of a deceased partner consents to the surviving partners continuing the business with the assets of the firm, his lien on property thereafter acquired will be postponed to that of creditors, when a case arises for an equitable marshalling of assets; as, where the surviving partners make a general assignment for the benefit of creditors.

2. In such case, the beneficiaries of the deceased partner's estate cannot have priority over the claims of creditors upon the partnership assets.

3. The property of minors, equally with that of adults, is subject to the *lex rei sitæ*, though the minors reside in another State or country. The local law may provide for the guardianship of such property, and for its administration and investment. By comity only will anything be conceded to the claims of the guardian of the domicile; although it is usual, by comity, to appoint, if due application be made for that purpose, the same person guardian who was appointed by the domiciliary court.

4. In the absence of constitutional restraint, the legislature may pass special laws for the sale or investment of the estates of infants or other persons who are not *sui juris*.

5. Where an executor and guardian in Rhode Island, by virtue of such a special law, and by order of the Probate Court, conveyed the property of infants to a manufacturing corporation, by way of investment in its capital stock, — *Held*, that the conveyance and investment were protected by the law, and that no account could be demanded except for the stock and its dividends.

6. Where minors were interested in a manufacturing establishment, as beneficiaries under a deceased partner, and the administrator, who was also their guardian, without any fraud, but with entire good faith, allowed the business to be continued by the surviving partners for several years, without filing any inventory or account; and the property suffered no deterioration, but increased in value, and was then, by virtue of a special law, transferred to a corporation created for the purpose; and the beneficiaries, after that, for more than seven years subsequently to coming of age, received dividends on their share of the stock and annual stated accounts, — *Held*, that, by reason of such acquiescence, they could not sustain a bill in equity for an account of the estate.

APPEALS from the Circuit Court of the United States for the District of Rhode Island.

The facts are stated in the opinion of the court.

*Mr. William Allen Butler* and *Mr. George F. Comstock* for the appellants.

*Mr. Charles Thurston* and *Mr. Benjamin F. Thurston, contra.*

MR. JUSTICE BRADLEY delivered the opinion of the court.

These cases come up on appeal from the decrees of the Circuit Court for the District of Rhode Island dismissing the complainants' bills. One of the bills was filed by William S. Hoyt and the other by Charles G. Francklyn and Susan his wife, against Amasa Sprague, William Sprague, individually, and as guardian of the said Hoyt and said Susan; Fanny Sprague, widow and administratrix of Amasa Sprague, Sen.; Mary Sprague, widow and administratrix of William Sprague, Sen., and formerly guardian of said Hoyt and said Susan; The A. & W. Sprague Manufacturing Company, and Zechariah Chafee, assignee of said company for the benefit of creditors, &c. The general object of the bills is, to establish a lien and trust in favor of the complainants, as grandchildren of William Sprague, Sen., against the property of the A. & W. Sprague Manufacturing Company, now in the hands of Chafee, the assignee, each to the extent of one twenty-fourth part of the whole property; that being the amount of their interest in the property of the former firm of A. & W. Sprague, which was transferred to the corporation in 1865, whilst the complainants were infants, in fraud, as they allege, of their rights.

Many charges of fraud are made in the bills against the defendants Amasa Sprague and William Sprague, who carried on the business of the firm after the death of William Sprague, Sen., in 1856, in connection with Byron Sprague, until 1862, and after that by themselves. The cases are substantially the same in all respects, and will be considered together.

In order properly to understand the questions raised it will be necessary to take a summary view of the facts.

Amasa Sprague and William Sprague, brothers, under the

name of A. & W. Sprague, carried on the manufacturing busi-
ness in Rhode Island until 1843, when Amasa died, leaving a
widow, Fanny Sprague, and four children, two sons and two
daughters.   The widow took out letters of administration on
her husband's estate.   The value of the partnership property at
that time was estimated at $100,000.   William continued to
carry on the business with the joint capital, under the same
firm name, for the benefit of himself and his brother's family,
for thirteen years, when, on the 19th of October, 1856, he died,
leaving a widow, Mary Sprague, a son, Byron Sprague, and four
grandchildren, who were the children of a deceased daughter,
Susan, and her husband, Edwin Hoyt, of the city of New York.
These children were at that time under fourteen years of age.
Their names were Sarah, Susan S., William S., and Edwin
Hoyt, Jr.   Sarah was twelve, Susan eleven, and William S.
was nine years old at the time of their grandfather's death.
William S. Hoyt is the complainant in one of the cases now
under consideration, and Susan S. Hoyt, now wife of Charles
G. Francklyn, with her husband, is complainant in the other
case.

William Sprague largely extended the business of the firm,
so that when he died the property, real and personal, was esti-
mated at about $3,000,000.   Shortly before his death, and dur-
ing his last illness, he took into partnership with him, evidently
for the purpose of continuing the business and keeping it to-
gether, his own son, Byron, and his two nephews, Amasa and
William, the sons of his deceased brother Amasa.   The terms
of this partnership, and the interest which the young men were
to have in it, does not appear.   They continued, after William
Sprague, Sen.'s, death, to carry on the business, as it had pre-
viously been carried on, under the name of A. & W. Sprague,
without making a settlement with the representatives or bene-
ficiaries of either Amasa Sprague's or William Sprague's
estate.

William Sprague, Sen., left no will; and his widow, Mary
Sprague, took out letters of administration on his estate.
Whilst, therefore, the three young men, Byron Sprague, Amasa
Sprague, and William Sprague, as surviving partners of Wil-
liam Sprague, Sen., carried on the business of the firm of A. &

W. Sprague, the persons really interested were, first, the two widows and administratrixes, Fanny Sprague and Mary Sprague, who were legally entitled respectively, by right of administration, to the several interests of Amasa Sprague, Sen., and William Sprague, Sen.; and, secondly, the beneficiaries, or distributees of the estates of Amasa and William, respectively, namely, the widow and four children of Amasa Sprague, Sen., and the widow and two children of William Sprague, Sen., — one of·the latter, Mrs. Hoyt, being deceased, and being represented by her four children.

One of the daughters of Amasa Sprague had been settled with before William's death, and the other shortly afterwards, by her brothers purchasing her interest. This left the beneficial interest of the property divisible into six equal parts, belonging respectively to Fanny Sprague, widow of Amasa, and her two sons, Amasa and William, and Mary Sprague, widow of William, her son Byron, and the children of her daughter, Susan Hoyt. These persons were all of age, and otherwise *sui juris*, except the Hoyt children, and were all able to consent, and did consent, that the·entire partnership estate should be continued in the business of the firm as it had been before. The Hoyt children, of course, could not give any such consent. They resided with their father, Edwin Hoyt, in New York, who was at the head of a commission-house in that city by the name of Hoyt, Spragues, & Co., which sold on commission a large portion of the goods manufactured by A. & W. Sprague. The partners of the firm were associated with him. Of course he must have been well acquainted with the business of the manufacturing establishment, and the large interest which his children had·in the concern must have insured his attention to its management. Mr. Hoyt consented to and approved of the continuance of his children's portion in the business of the partnership; and his natural regard for their interests, in connection with his opportunities for observation, preclude the presumption that such continuance was the result of any fraudulent scheme. Had any such scheme been in contemplation, he must have detected and would have thwarted it.

In addition to the consent and acquiescence of their father,

was that of their property guardian in Rhode Island. On the 9th of February, 1857, shortly after William Sprague, Sen.'s, decease, letters of guardianship were issued by the Probate Court of the town of Warwick, R. I., to Mary Sprague, grandmother of the Hoyt children, on the property of said children. Mrs. Sprague consented that both her own interest in the estate and that of her grandchildren and wards should be continued in the partnership business. At that time (1857) this business was no doubt regarded by most persons who had any acquaintance with it as highly prosperous, and an investment in it advantageous and safe. And whilst, according to the strict rules of law, Mary Sprague should have drawn out the children's share, and should not have left it to the hazards of trade, it may be said in her excuse that she was following out the plan of her husband, who had for thirteen years induced his brother's widow to continue the interest of her children in the concern, and had thereby greatly increased their inheritance. At all events, we have no evidence that Mary Sprague was actuated by any other than the most worthy motives in permitting everything to remain in the business. Any charge of fraud against her cannot be entertained for a moment.

The business was conducted without change until 1862, when Byron Sprague sold out his interest to Amasa and William, and upon an account taken at that time said interest was valued at $605,722.78, which amount was accordingly paid to him. No other change in the situation of the parties interested took place until 1865, when it was proposed to place the property of A. & W. Sprague in a corporation, or corporations, charters having been obtained from the legislature of Rhode Island for that purpose. One of these charters was passed in May, 1862, and constituted Byron Sprague, William Sprague, and Amasa Sprague, and their associates, successors, and assigns, a body corporate and politic by the name of A. & W. Sprague Manufacturing Company, with a capital stock of $1,000,000, to be divided into shares of $100 each.

In view of such proposed corporate organization, Mary Sprague, as guardian of her grandchildren, and Edwin Hoyt, their father, in January, 1863, presented a petition to the legis-

lature of Rhode Island, in which, after stating the appointment of Mary Sprague as the guardian of the estate of said minors, and their interest in the property of A. & W. Sprague, they stated that they deemed it advisable to invest the same in such corporations as should be organized under the charters previously granted; and they asked that the said Mary, as such guardian, might be authorized to make such conveyance as would be necessary to that end. On the 9th of March, 1863, a joint resolution of the legislature was passed, granting said petition, which resolution was in the following terms : —

" Resolution authorizing Mary Sprague, of Warwick, guardian, to make conveyance of the interest of minors in and to the property of the firm of A. & W. Sprague.

" Upon the petition of Mary Sprague, of Warwick, widow of William Sprague, late of Warwick, deceased, and of Edwin Hoyt, of the city and State of New York, representing that the said Mary is guardian of the estates; and the said Edwin, father of Edwin Hoyt, Jr., Susan S. Hoyt, Sarah Hoyt, and William S. Hoyt, minor children and heirs-at-law of Susan Hoyt deceased, and praying, for certain reasons, that the said Mary may be authorized. and empowered to make conveyance in her said capacity, of all the right, title, and interest of said minor children, as heirs-at-law of their said mother, in and to all the estate and property, real, personal, and mixed, now held, owned, and managed by the firm of A. & W. Sprague of Providence:

" *Voted and resolved*, that the prayer of said petition be and the same is hereby granted; and the said Mary Sprague, in her capacity. as guardian of the estate of Edwin Hoyt, Jr., Susan S. Hoyt, Sarah Hoyt, and William S. Hoyt, is hereby authorized and fully empowered, whenever any corporation or corporations shall be organized under either or any of the charters heretofore granted by the General Assembly of this State, and conveyance or conveyances shall become necessary to vest the title of the parties interested in any of said property so held, owned, or managed by the firm of A. & W. Sprague, in any such corporation or corporations, to make, execute, seal, acknowledge, stamp, and deliver all and any such conveyance and conveyances to any such corporation or corporations as shall be necessary to vest the right, title, and interest of the said minors in and to said property, or any portion thereof, in any such

corporation or corporations; and that any such conveyance or conveyances so executed, acknowledged, stamped, and delivered shall be deemed and held as valid and effectual in law and in equity to vest the title of said minors in any such corporation or corporations as though the same were executed, acknowledged, stamped, and delivered by said minors after attaining their majority.

" *Provided*, that before the delivery of any such conveyance or conveyances, the said Mary shall have executed and delivered to the Court of Probate of Warwick every such bond or bonds with herself in her said capacity, and said Edwin Hoyt, as principals, in such penal sum or sums and with such sureties as said probate court shall require, conditioned for the investment of the amount of the full value of the interests of said minors, which she shall then be about to convey in the capital stock of any such corporation or corporations to which the same shall be conveyed, in the names and for the use and benefit of said minors."

Further, in view of the proposed corporate organization, steps were taken by the parties in interest to ascertain the value of the partnership assets, and the relative interest of each shareholder. For this purpose an agreement was entered into on the first day of April, 1865, between all the parties, Fanny Sprague signing individually and as administratrix of Amasa Sprague; Mary Sprague signing individually and as administratrix of William Sprague and as guardian of her grandchildren; and the other parties signing in their own behalf: by which it was agreed that John A. Gardner and Benjamin F. Thurston, the former of whom had been counsel for Amasa Sprague and William Sprague, and the latter counsel of Mary and Byron Sprague, should be, and they were, appointed referees to examine into the entire assets and property of the firm, and to ascertain the value thereof, and each party's interest therein, and should make report of the result. The referees accordingly made such examination, and made their report on the first day of July, 1865, by which they reported and found that the cash value of the entire estate, exclusive of the Quidnick factory (which was estimated by itself, and was transferred to a separate corporation), was    $6,732,906 69
That there were liabilities to amount of . . . .    2,871,921 79
Leaving the net value of the estate equal to . .    3,860,984 90

And after adjusting the accounts of the parties they found —

| | |
|---|---:|
| Mary Sprague's interest was | $624,984 69 |
| Fanny Sprague's interest | 625,511 69 |
| William Sprague's interest | 978,867 42 |
| Amasa Sprague's interest | 978,867 42 |
| Mary Sprague, guardian of the children of Susan Hoyt | 652,753 68 |
| Due to Mary Sprague, as administratrix of her husband, on account of a dividend | 164,250 26 |
| Making a total of | $4,025,235 16 |

* This amount formed the capital stock of the corporation subsequently organized, and was represented by the nominal capital of $1,000,000, making each share equal to over $402. The proportions of William and Amasa were larger than the others, because they had purchased the share of Byron.

The referees also found due from the firm to Mary Sprague, as guardian of the Hoyt children, the sum of $188,333.33, explained to have been a balance credited to them to equal what the two families in Rhode Island had drawn out of the concern for current expenses.

The Quidnick property, which, as before stated, was kept separate from the rest on account of other persons being interested therein, was appraised in the same way as the A. & W. Sprague property, for the purpose of being transferred to a distinct corporation. The interest of the Hoyt children therein was appraised at $63,353.23.

The appraisement having been completed, Mary Sprague, as guardian of the Hoyt children, on the 5th of August, 1865, after advertising her intent so to do, presented her bond to the Probate Court of Warwick for approval, as required by the joint resolution of March 9, 1863, and prayed authority from the court to transfer the interest of her wards to the A. & W. Sprague Manufacturing Company, as authorized by said resolution; and also prayed like authority to transfer the interest of the minors in the Quidnick property to the Quidnick Manufacturing Company.

A decree was made granting the prayers of the petition and conferring the powers desired.

Thereupon, on the ninth day of August, 1865, all the parties in interest joined in a conveyance of the entire partnership property of the firm of A. & W. Sprague to the A. & W. Sprague Manufacturing Company; and the property of the Quidnick firm to the Quidnick Manufacturing Company; and each party became entitled to their several proportions of the shares of capital stock in those companies respectively. In executing the deed of conveyance Mary Sprague signed in her individual capacity, as administratrix of her husband's estate, and as guardian of the Hoyt children.

In the August Term, 1866, of the Probate Court of Warwick, appraisers were appointed to take an inventory and appraisement of the property of the several wards of Mary Sprague in her hands, and they performed their duty, and said inventories, verified by the oath of Mary Sprague, were filed and recorded, after being passed upon by the court. They amounted to the sum of $251,447.08 each. That of William S. Hoyt was composed of the following items, namely:—

| | |
|---|---:|
| 122 shares Nat. B'k of Commerce | $6,222 00 |
| 1 U. S. 6-per-cent bond | 108 09 |
| 2 N. Y., Prov., & Boston R. R. bond, $950 | 1,900 00 |
| 439 shares A. & W. Sprague M'f' Co., 402, 5,225 | 176,707 82 |
| 123 shares Quidnick Co. stock, 155, 213 | 19,091 20 |
| Cash | 334 23 |
| | $204,363 75 |
| Dividend due from A. & W. Sprague as cash, March 31, 1865, with interest from that date | 47,083 33 |
| | $251,447 08 |

The others were nearly identical with this.

The dividend of $47,083.33 was William S. Hoyt's one-fourth part of the sum of $188,333.33 awarded to the Hoyt children as an offset to the sums drawn out by the Rhode Island families for current expenses.

At the same term Mary Sprague presented an account as guardian of each ward, which being verified, and due notice having been published, was received and allowed by the court, and ordered to be recorded.

Sarah Hoyt having now arrived at full age, received the amount of her interest and gave an acquittance for the same.

At the same term of the court, on the petition of Mary Sprague, and her resignation of the guardianship of the three remaining minors, and on the written application of Edwin Hoyt, and due notice given, Mary Sprague was discharged from the guardianship, and William Sprague was appointed guardian in her stead. The same appraisers were appointed to make an inventory and appraisement of the property of each ward in the hands of William Sprague, guardian; and such inventory and appraisement were duly made, filed, and recorded; showing that the estate of William S. Hoyt amounted, on the first day of September, 1866, to the sum of $255,885.04, consisting of the items before mentioned, with the addition of another dividend of the companies.

The estate of Susan S. Hoyt amounted to about the same sum.

Susan S. Hoyt came of age in October, 1866, and William S. Hoyt in January, 1868; and Susan married Charles G. Francklyn in 1869.

The evidence in the case exhibits several annual accounts rendered by William Sprague, as guardian to the complainant W. S. Hoyt, after he came of age, in 1870, 1871, 1872, and 1873. These accounts show on the credit side the money due and accruing to the complainant, including the sum of $47,083.33 before mentioned, and the dividends made from time to time on the stocks of the A. & W. Sprague Manufacturing Company, the Quidnick Manufacturing Company, and on the bank and other stocks in the guardian's hands. On the debit side they show the moneys drawn by and paid to the complainant, amounting, from the date of Mr. Sprague's appointment as guardian in 1866, to Oct. 31, 1870, to the sum of $5,282.45 : —

thence to Oct., 1871 . . . . . . . . $8,606 72
to Oct., 1872 . . . . . . . 18,500 00
to Oct., 1873 . . . . . . . . 5,000 00

Leaving a balance still in the guardian's hands of $63,905.18, besides the stocks and bonds forming the corpus of the estate in ward.

William S. Hoyt, some time in 1873, received his stocks
and interest in the Quidnick Company, and makes no com
plaint in regard to the same.

A number of letters of the complainant, asking for, and ac-
knowledging the receipt of, money from his guardian, after
coming of age, were put in evidence. One of these, dated Nov.
9, 1870, was directed to Mr. Greene, book-keeper of the A. & W.
Sprague Manufacturing Company, asking for a memorandum
of the bank stock, shares, and whatever there might be belong-
ing to him. In his testimony the complainant states that this
information was furnished to him. A similar statement had
been furnished to Mrs. Francklyn in March of the same year;
and annual accounts were rendered to her from October, 1869,
to October, 1873.

In the fall of 1873, Hoyt, Spragues, & Co. and the A. & W.
Sprague Manufacturing Company suspended payment, and the
latter, by deed of assignment dated Nov. 1, 1873, assigned to
Zechariah Chafee all its property, in trust for the benefit of
creditors, — in which deed Amasa and William Sprague, and
Fanny and Mary Sprague also joined. In April, 1874, a more
full assignment was made.

The bills in this case were filed in June and July, 1875, and
their general object has already been stated. They respectively
state most of the facts of which the foregoing is an outline;
but interlarded with reiterated charges of fraudulent design
and concealment on the part of the Spragues: whereby, as is
alleged, the complainants were kept in ignorance of their
rights and of the state of their property, and the transformations
under which it went, until shortly before the filing of the bill.

The defendants severally answered the bills, denying all
fraudulent motives and any intentional concealment; averring
that they acted according to their best judgment as to what
was for the interest of all the parties interested in the estate;
insisting upon the legal validity of their proceedings respec-
tively, and especially of the transfer of the minors' interest to
the corporations; setting up the laches and acquiescence of the
complainants; and pleading the Statute of Limitations to the
relief sought by the bill.

The first question to be determined is, the nature of the

complainant's rights, with regard to the partnership effects of A. & W. Sprague in 1865, at the time when the property was transferred to the A. & W. Sprague Manufacturing Company.

At the death of William Sprague, Sen., in 1856, there is no doubt that each party in interest was entitled to call for a liquidation and settlement of the partnership affairs and a division of the surplus property, and had a lien on the entire property and effects for that purpose. In the real estate and corporal chattels they were tenants in common with the surviving partners, and over the entire property including the credits and other assets they had the lien referred to, which they had a right to enforce at once if the surviving partners refused to make a settlement. These partners had the right of possession, and, in the choses in action, the right of property, to enable them to settle up the concern. But these rights of survivorship were subordinate to the lien of those beneficially interested, who thereby had a right to enforce the due appropriation of the partnership effects.

But who were the parties beneficially interested in this case? Primarily, the personal representatives of Amasa Sprague, Sen., and William Sprague, Sen.; namely, the two widows, Fanny Sprague and Mary Sprague, administratrixes respectively of the estates of Amasa and William. The ultimate beneficiaries could only reach the property through them. If they abused their trust they would be liable to their respective *cestuis que trust.* They had the power, if they saw fit, unless restrained by their beneficiaries, to allow the estates of their deceased intestates to be continued in the business of the partnership; and if it was continued by their allowance and consent, the property became liable to the partnership debts subsequently incurred as well as to prior debts; but with this qualification, that the property which remained unchanged was still subject to the partnership lien in preference to after-incurred debts; whilst new property which, in the course of business, took the place of the old, was not subject to said lien in preference to such debts.

This seems to be the result of the cases, though they are apparently somewhat in conflict. A cursory reading of the opinion in *Skipp* v. *Harwood,* (1747), (2 Swans. 586), and Lord

Hardwicke's opinion in the same case on appeal, *West* v. *Skipp* (1 Ves. Sen. 239), and the opinions in *Stocken* v. *Dawson* (9 Beav. 239), and same case on appeal (17 Law J. Ch. 282), would lead to the conclusion that the executor's lien in such cases attaches to the whole property, as well that newly acquired as that which remains of what was in existence at the testator's or intestate's decease. But this is inconsistent with the decisions in *Nerot* v. *Burnand* (4 Russ. 247) and *Payne* v. *Hornby* (25 Beav. 280; s. c. 4 Jur. N. S. 446), which hold that where the business is carried on with the consent of the outgoing partner, or the representative of the deceased partner, debts incurred during that period have a preference over the partnership lien upon all newly acquired property. A comparison of the cases will show that the rule laid down by Lords Hardwicke and Cottenham in *West* v. *Skipp* and *Stocken* v. *Dawson* was applied by them to cases in which the property of the retiring or deceased partner was used in the business against the will, or without the consent, of the persons entitled thereto. The law is laid down with much accuracy in the last edition of Lindley on Partnership, pp. 700–702, where it is said: " Whilst the partnership lasts, the lien attaches to everything that can be considered partnership property, and is not therefore lost by the substitution of new stock for old. Further, on the death or bankruptcy of a partner, his lien continues in favor of his representatives or assignees, and does not terminate until his share has been ascertained and provided for by the other partners. But after the partnership is dissolved, the lien is confined to what was partnership property at the time of the dissolution, and does not extend to what may have been subsequently acquired by the persons who continue to carry on the business."

Sir John Romilly, in giving judgment in *Payne* v. *Hornby*, cited above, after admitting that, by a mortgage of his stock in trade, a man might bind after-acquired property (as to which see *Holroyd* v. *Marshall* (10 H. L. Cas. 191), said: " But on the death of a partner the case is altogether different. There is, as Lord Eldon very accurately expresses it, ' a *quasi* lien; ' there is, in point of fact, only a right to the specific property. The executors of the deceased partner are joint tenants with

the surviving partners, and accordingly they are entitled to require the surviving partners to do one of two things, — either to wind up the partnership business at once, or to fix the value of the testator's property and secure payment of the amount. . . . If the executors do not apply for a receiver, but simply file a bill for the winding up of the partnership, I apprehend that the new stock which has been acquired during the time that the business has been carried on by the surviving partner belongs, in the first place, to the creditors who have been created by such subsequent dealings, and not to the creditors of the old partnership; and that it is the duty of the executors, if they wish to prevent any dealings with the stock, to come at once to this court for the appointment of a receiver; otherwise they, in fact, sanction the commission of a fraud, by leading the subsequent creditors to believe that they are dealing with a person who is liable out of his stock in trade to discharge their debts." 4 Jur. N. S. 446.

These remarks of the Master of the Rolls have respect to the rights of creditors. As between the surviving partners themselves and the representatives of the deceased partner, the lien of the latter will extend to after-acquired property resulting from the employment of the partnership stock, so as to entitle them, at their option, either to demand a share of the profits, or interest on the value of the decedent's share at the time of his death; unless the transactions between them have been such as to indicate a sale of the deceased partner's share to the survivors. A sale, however, can hardly be inferred where no steps have been taken to ascertain the value of the share.

Recurring now to the circumstances of the case before us and the proceedings of the parties, we find that the legal representatives of the deceased partners, and all the beneficiaries of the two estates who were in law capable of acting, entirely acquiesced in, and consented to, the continued employment of the partnership property in the business of the partnership subsequently carried on by the surviving partners; and this state of things continued for the eight or nine years that intervened between the death of William Sprague, Sen., and the transfer of the property to the corporations. And as to the share of the Hoyt children, it was not only consented

to by Mary Sprague as administratrix of her deceased husband's estate, but as guardian of the property of the said children.

It seems to have been an understood thing between all the parties, from the beginning, that, without any formal settlement of the estates of Amasa and William Sprague, Sen., the several beneficiaries entitled to distribution should be and were considered as interested in the common partnership property in the proportional amount of their beneficial interest. The active partners represented their own respective shares. Mary Sprague as administratrix and as guardian of the Hoyt children represented her own share and theirs. It is objected to her that she omitted to file any inventory or account; but as there was no difficulty or dispute between the parties in interest as to the extent of the several shares, there was no imperative necessity of presenting accounts to the Probate Court as long as it was deemed expedient to continue all the property in the joint business. An inventory could settle nothing, because the property in which all were equally interested was constantly changing, and an account would have had no practical value, because no immediate settlement of the estate was proposed. The cardinal question, so far as these cases are concerned, was that which related to continuing the shares of the minors in the concern, and keeping the property together. Conceding that to have been the proper course to take, the omission on the part of Mary Sprague to exhibit the accounts prescribed by statute cannot be regarded in the same light as it would have been if she had had possession of the property and was devoting it to her own use. It may have been unwise, but, under the circumstances, it can furnish no evidence of want of good faith, or a desire to do other than the best that could be done for the interests of her grandchildren and wards.

And as to the question of fraud, we may at once state, that we entirely agree with the court below, that the case furnishes no evidence to sustain that charge, either as against Mary Sprague or any of the other parties concerned. They may have judged unwisely, but we see no ground for believing that they were actuated by any desire to cheat or defraud the children of Susan Hoyt out of anything that justly belonged to them.

We are sure that such a thought could not be attributed to their grandmother, and we have no evidence to believe that it was ever entertained by Amasa Sprague or William Sprague. We must regard the decision of Mrs. Sprague, and of Edwin Hoyt, the father, to keep the property of the children in the concern, as an error of judgment only, rather than as the result of any design or intent to defraud. We may well conceive that the supposed wishes of William Sprague, Sen., who by his energy and talent had created the estate, and who had persistently kept it together as a common property for the equal benefit of his brother's family and himself, had great weight with Mrs. Sprague and her son-in-law, as well as with the surviving partners, in leading them to adopt the conclusion they did. And for many years the result seemed to justify the conclusion to which they came.

But whatever may have been the responsibility which Mary Sprague, as administratrix and guardian assumed, it cannot be doubted that she had the power to keep the property in the business, for it was subject to her disposal. And as it was kept in the business by her consent and allowance, she ceased to have a lien upon the property as against subsequent creditors of the concern. And, as she in her representative capacity ceased to have such lien, it is difficult to see how the minors themselves, when they arrived at full age, could have any such lien, whatever remedy they may have had against Mary Sprague. If the ultimate beneficiaries of a deceased partner's estate could thus revive a lien which has become extinguished as against creditors, there would be little safety in dealing with commercial partnerships, in which any partner has ever died.

This consideration is conclusive against the claim made by the bills to be paid out of the assets in the hands of Chafee, the trustee, in preference to, or even *pari passu* with, the creditors of the corporation. For where the representative of a deceased partner allows the interest of his decedent to be used in the business by the surviving partner, and thereby loses his lien upon the partnership property, he does not thereby become a creditor of the new firm, and cannot come into concourse with the creditors thereof; but the property of the firm is first subject to the claims of such creditors, and after they are satisfied

the representative's right to have an account against the sur·
viving partner remains as before.

But whilst the rights of creditors are thus protected against
the lien of a deceased partner's representatives, who have con-
sented to the continuance of the business without a settlement,
the beneficiaries standing behind those representatives are en-
titled to call them to an account for the manner in which they
have dealt with the estate.  And where, as in this case, they
depart from the ordinary mode prescribed by law, and expose
the property to the hazards of trade, they run the risk of mak-
ing themselves answerable for any loss that may occur.  In the
present case, however, we have no evidence that loss occurred
during the period under consideration.  The estimated cash
value of the minors' share of the property on the 31st of
March, 1865, as appeared by the appraisement then made,
was . . . . . . . . . . . . . . . . . $652,753 68
Allowance to offset family expenses of the other
    parties . . . . . . . . . . . . . . 188,333 33
Interest in Quidnick property, including E.
    Hoyt's curtesy . . . . . . . . . . 116,112 93
        Total . . . . . . . . . . . . $957,206 94

As gold was then 150, the specie value of this total would be
$638,137.96.  No satisfactory proof has been adduced to show
that this amount was not fully equal to what the interest of the
minors ought to have been in view of the value of the estate in
1856, at the time of William Sprague, Sen.'s, decease.

Up to the time of organizing the corporations, therefore, and
the transfer of the property thereto, we have no evidence that
any loss, or diminution of value, had occurred.

Still, if the matter stood there, the defendants, or at least
Mary Sprague, might be called upon to render an account, and
to show by affirmative proof that all the property which came
into her hands as administratrix, or guardian, for the use and
benefit of her daughter Susan's children, was forthcoming and
ready to be paid over to them.  It is necessary, therefore, to
take into view what occurred in 1865 and afterwards, in rela-
tion to the disposition made of the property to the corporations
before referred to, and to the conduct of the complainants after

coming of age, in order to determine whether they are entitled to any portion of the relief sought by the bills.

It is contended by the defendants that the authority given to Mary Sprague, as guardian of the Hoyt children, by the joint resolution of 1863, to transfer all the property of her wards to the corporations indicated, was a complete justification for her acts in that behalf; and releases her from all further obligation except that of accounting for the shares of capital stock received therefor and any dividends accruing thereon whilst in her possession.

It is contended by the defendants, secondly, that the complainants, after coming of age, had so long acquiesced in the arrangements made in 1865, before bringing suit or taking any steps to set them aside, that they are now precluded by their own laches and by the lapse of time from having the relief which they seek.

As to the first point, it seems to be beyond doubt, that if the legislature had the power to pass the resolution referred to, it was a complete authority and justification for the conveyance by Mrs. Sprague of the interests of her wards to the corporations mentioned. The resolution itself is sufficiently broad to give the requisite authority. The question is as to the legislative power.

With regard to the general legislative power of a State to act upon persons and property within the limits of its own territory there can be no doubt. Mr. Justice Story lays down three fundamental rules on the subject of private international law, the first of which is expressed thus: "I. The first and most general maxim or proposition is that which has been already adverted to, that every nation possesses an exclusive sovereignty and jurisdiction within its own territory." And he adds, " The direct consequence of this rule is, that the laws of every State affect and bind directly all property, whether real or personal, within its territory, and all persons who are resident within it, whether natural-born subjects or aliens, and also all contracts made and acts done within it." The second rule declares that no State or nation can, by its laws, directly affect or bind property out of its own territory, or persons not resident therein. The third is, that whatever force and obliga

tion the laws of one country have in another, depend solely upon the laws of the latter, that is, upon the comity exercised by it.   Story, Conflict of Laws, sects. 18–23.

One of the ordinary rules of comity exercised by some European States is, to acknowledge the authority and power of foreign guardians, that is, guardians of minors and others appointed under the laws of their domicile in other States.   But this rule of comity does not prevail to the same extent in England and the United States.   In regard to real estate it is entirely disallowed; and is rarely admitted in regard to personal property. Justice Story, speaking of a decision which favored the exterritorial power of a guardian in reference to personal property, says: "It has certainly not received any sanction in America, in the States acting under the jurisprudence of the common law.   The rights and powers of guardians are considered as strictly local; and not as entitling them to exercise any authority over the person or personal property of their wards in other States, upon the same general reasoning and policy which have circumscribed the rights and authorities of executors and administrators."   Story, Confl. Laws, sects. 499, 504, 504 *a*.   And see Wharton, Confl. Laws, sects. 259–268, 2d ed.; 3 Burge, Colon. and For. Laws, 1011.   And some of those foreign jurists who contend most strongly for the general application of the ward's *lex domicilii* admit that, when it comes to the alienation of foreign assets, an exception is to be made in favor of the jurisdiction within which the property is situate, for the reason that this concerns the ward's property, and not his person.   Wharton, sects. 267, 268.

But whilst the English and American law require a guardianship where the property is situated, it is conceded, that, in the due exercise of comity, preference would ordinarily be given to the person already clothed with the authority of guardian in the minor's own country.   Phillimore, vol. iv. 381; Wharton, sect. 266.   In the case before us it does not appear that the minors had any other guardian in New York than their natural guardian, Edwin Hoyt, who applied for the appointment of Mary Sprague as guardian of their estate in Rhode Island.

As the question before us is one of power and not of comity,

we think there can be no doubt that the legislature of Rhode Island, where the property was situate, had power, first, to pass laws for the appointment of guardians of the property of non-resident infants, situate in that State; and, secondly, it had power to prescribe the manner in which such guardians shall perform their duties as regards the care, management, investment, and disposal of such property; and that this power is as full and complete as where the minors are domiciled in the State.

Not only did the power exist, but we find that it was exercised. The laws of Rhode Island gave explicit power to the Probate Court to appoint a guardian of the property of non-resident infants. The act of Oct. 31, 1844, declared that " the courts of probate of the several towns are hereby authorized and empowered to appoint guardians, when occasion shall require, over the property or estate of persons who reside out of the State and possess property therein." The previous act of Jan. 6, 1837, had authorized the same courts, in case of incapacity of parents of any minors, or for other sufficient cause, to appoint a guardian of the property of such minors, without connecting therewith the guardianship of such minors' persons.

There is no force in the objection made to these laws, that they give chancery powers to the Probate Court, contrary, as contended, to sect. 2 of art. 10 of the Constitution of Rhode Island adopted in 1843, which says: " Chancery powers may be conferred on the Supreme Court, but on no other court to any greater extent than is now provided by law." The answer to this objection is obvious. The appointment of guardians is not, and never has been, peculiarly a chancery power. Guardians at common law became such by their relation to the minor, without any judicial appointment. Guardians were also appointed by testament by the father of any minor from time immemorial in the province of York, and on failure to thus appoint, the ordinary had the power of appointment. Swinburne on Wills, 282. In this country the power to appoint guardians and to pass upon their accounts has generally by statute been conferred upon the probate courts. In Rhode Island the power was exercised by these courts long before the Constitution of 1843 was adopted.

Assuming, then, that the Probate Court had the power to make the appointment, we have been unable to see anything informal or improper in the appointment of Mary Sprague as the guardian of her infant grandchildren. The petition for her appointment was made by the most suitable persons in the world, — their father, Edwin Hoyt, and Byron Sprague, their mother's only brother.

It is true, as suggested, that the duties of Mary Sprague as administratrix might clash with her duties as guardian; but this was not a necessary consequence. The same person is often appointed executor of a will and guardian of the testator's children. It is seldom that any practical difficulty arises from the joinder of the two capacities. We do not perceive that their joinder in the present case had, or was likely to have, any deleterious effect upon the interests of the infants concerned. At all events, it did not avoid or vitiate the appointment.

The guardian having been duly appointed, and no deterioration of the estate being shown prior to the conveyance to the corporations, the next inquiry relates to the authority for making such conveyance, given by the joint resolution of 1863. As already intimated, it cannot be doubted that the legislative power extends to the regulation of the investments and the management of minors' estates by their guardians. The legislature certainly might, if it saw fit, pass a general law authorizing a guardian to invest the property of his ward in the capital stock of a corporation engaged in manufacturing, trading, or financial operations, or in a particular class of operations, as banking, insurance, or any other that might be specified. Usually, such authority, if given, would be required to be exercised under the allowance and supervision of a court; but that would be a matter of legislative discretion. That such an authority could be conferred by law there can be no doubt. Analogous powers have been conferred from time immemorial.

But it is objected that the resolution of March 9, 1863, under which the guardian in this case derived her authority to make the investment under consideration, was not a legislative, but a judicial act, and beyond the legislative power.

The only provision in the Constitution of Rhode Island which

bears upon this question is the usual one which distributes the powers of government into three departments, legislative, executive, and judicial, and assigns to each the powers appropriate to it. Thus, " The legislative power shall be vested in two Houses," &c. " The judicial power shall be vested in one Supreme Court, and in such inferior courts as the General Assembly may, from time to time, ordain and establish."

The question of the power of a legislature, when not restrained by a specific constitutional provision, to pass special laws, has been much mooted in the courts of this country; and it would subserve no useful purpose to go over the whole ground of controversy on this occasion. Suffice it to say, that laws of this character, for the purpose of healing defects, giving relief, aid, and authority in cases beyond the force of existing law, have been frequently passed in almost every State in the Union, and have received the sanction not only of this court, but of other courts of high authority. The exercise of this power has been most conspicuous in that class of cases in which the legislature has been called upon to act as *parens patriæ* on behalf of lunatics, minors, and other incapacitated persons. Laws authorizing the sale of the estates of such persons have frequently been passed, and have been upheld as fairly within the legislative power. The passage of such laws is not the exercise of judicial power, although by general laws the discretion to pass upon such cases might be confided to the courts. But when it is not confided to the courts, the power exercised is of a legislative character, the legislature making a law for the particular case. In some modern constitutions the exercise of this power has been prohibited to the legislative department. But where not so prohibited, and where it has never been authoritatively condemned in the jurisprudence of the State, we cannot deny to the legislature the right to exercise it in those cases in which it has been accustomed to be exercised, amongst which we think the present case may be fairly reckoned. Such laws are not judgments upon any person's rights, but they confer powers upon the exercise of which judgment may afterwards be given.

The only cases in Rhode Island decided since the adoption of the Constitution of 1843, which have been cited as having a

bearing on the subject, are *Taylor* v. *Place*, 4 R. I. 324, and *Thurston* v. *Thurston*, 6 id. 296. The general conclusion to be derived from these cases is favorable to the view we have taken.

In the first of these cases, the legislature having passed a vote for opening a judgment, allowing new affidavits to be filed on the ground of accident and mistake, setting aside a verdict and granting a new trial, the court very properly held this to be an exercise of judicial power, and declared the vote to be void. But they distinguished the case from those laws passed to confer special powers upon executors, &c.; as in *Watkins* v. *Holman* (16 Pet. 25), where an act authorizing an administratrix residing in another State to sell land in Alabama for the purpose of paying debts was held by this court to be within the legislative power and valid. In the other case cited (*Thurston* v. *Thurston*), the court held that it was beyond the power of the Court of Chancery in that particular case to decree a sale of infants' lands; that the power, if possessed by any court, was vested by statute in the Probate Court; but added: "If a case should arise within the spirit, though not within the letter, of such or a similar statute, a special authority to a trustee to convert the real estate of his infant, lunatic, or otherwise incapable *cestui*, would seem to partake, as intimated by this court in *Taylor* v. *Place*, more of a legislative than of a judicial character, and would be, having been long exercised and not prohibited by the Constitution, within the constitutional competence of the General Assembly. *Watkins* v. *Holman*, 16 Pet. 25; *Davis* v. *Johonnot*, 7 Met. 388; *Snowhill* v. *Snowhill*, 2 Green, Ch. 20; *Norris* v. *Clymer*, 2 Barr, 277; *Spotswood* v. *Pendleton*, 4 Call, 514; *Dorsey* v. *Gilbert*, 11 Gill & Johns. 87." This is certainly a very clear intimation of the constitutionality of the class of laws to which that now under consideration belongs.

But another objection made to the validity of the joint resolution is that it was not in proper form, in not being preceded by the proper enacting clause. The Constitution declares that the style of the laws shall be: "It is enacted by the General Assembly as follows." If this requirement is anything more than directory, it cannot be decreed to apply to that species of

enactments which are usually denominated joint resolutions, and which are often used to express the legislative will in cases not requiring a general law. The practice of the Congress of the United States, and of almost every legislative body in the country, may be adduced to show that a resolution of the nature now under consideration could not have been within the intent of the provision referred to.

It is unnecessary to enter upon a particular review of the proceedings taken by the parties to effect a transfer of the partnership estate to the corporations chartered for that purpose. We have given them our careful attention, and are satisfied that they were substantially regular. We have no doubt of the guardian's power to submit to referees the ascertainment of the value of the minors' interest in the property; nor of the binding effect of the award made by the referees. Our conclusion is that the guardian, Mrs. Mary Sprague, had full power and authority to invest the said interest in the capital stocks of the corporations referred to; and that having done so, she was no further answerable therefor, but only answerable for the shares of capital stock and the dividends realized thereon, respecting which we do not understand that any complaint is made.

But aside from the legality and binding effect of the proceedings for investing the minors' interest, as here stated, the acquiescence of the complainants, after they came of age, effectually precludes them from obtaining the relief sought by their respective bills. The bills were not filed until June and July, 1875, in the one case nearly nine years, and in the other more than seven years after the minors became *sui juris*, and could have known, if they did not know, the exact position and history of their property. Notwithstanding all the asseverations to the contrary, the evidence fails to show that they were not allowed every opportunity of which they chose to avail themselves of obtaining this knowledge. And the fact is clearly demonstrated that they did have sufficient knowledge to leave them without any excuse for lying by and giving no sign of dissatisfaction. For several years they received regular annual accounts. These accounts showed the character of the property, and in what it consisted. It further appears that in 1870

each of the complainants received from the book-keeper in Rhode Island a list of all the stocks and securities in which they were respectively interested. It also appears that they accepted the stock of the Quidnick Company, and they make no complaint of that part of the settlement.

Without further discussion, it suffices to say, that the complainants came into the court too late to obtain relief, even if when they came of age they could have justly complained of the conversion of their property into the stock of the corporations. In such cases, it is not merely a question as to what information respecting their rights parties do actually obtain; but as to what information they might have obtained had they used the means and opportunities directly at their command. Others, acting in good faith, also have rights; the world must move; and it is the interest of the community that controversies should have an end.

*Decrees affirmed.*