# CHARLESTON.

HENRY G. DAVIS *et al.* v. DAVIS TRUST COMPANY

(No. 6205)

Submitted October 9, 1928. Decided October 23, 1928.
Rehearing Denied October 23, 1928.

230

*Henry M. Earle, H. G. Rummel* and *Donald O. Blagg,* and *H. G. Kump,* for appellants.

*Spears & Irons* and *Frank Cox,* for appellee.

HATCHER, JUDGE:

This suit involves the administration of a trust. The will of Henry G. Davis, probated March 15, 1916, devised to his infant grandchildren, Henry G. Davis, Jr., and Hallie E. Davis, $150,000.00 and $100,000.00 respectively, in bonds of the Coal & Coke Railway Company. The will directed that. the bonds be deposited with and held in trust by the Davis Trust Company; that the income therefrom be expended for the benefit of the children until they respectively reached the ages of twenty-one, when each was to receive one-half of the portion devised; and that the remaining moieties were to continue in the trust until each arrived at the age of thirty years (except $25,000.00 for Henry to be held until he became forty), the income to be paid to the beneficiaries. The will also provided that if the principal of the bonds be paid prior to their distribution, the trust company should invest the proceeds in "other safe interest bearing securities".

The inheritance tax reduced the bequests to $239,000.00. Bonds of the railroad company in that amount were delivered to the trustee by the executors of the will, "some time prior to April 1, 1917". The bonds yielded interest at the rate of five per cent and matured April 1, 1919. On March 31, 1917, the trustee exchanged all of these bonds with John T. Davis for preferred stock of the West Virginia Coal & Coke Company of the par value of $239,000.00, which stock called for dividends at the rate of six per cent. The Coal Company had

just been organized at the time of the exchange. It was the successor of the Davis Colliery Company which operated about 25,000 acres of coal land, and which was owned by the Davis family. The financial history of the Colliery Company over a number of years is bad. By 1917 it was *"in extremis"*, as one witness said, and could proceed no longer as a going concern. A reorganization was then effected by which its debts were paid, its holdings transferred to the West Virginia Coal & Coke Company, and its stockholders received preferred stock in the latter. Other coal lands amounting to about 100,000 acres were also transferred to the coal company, which started in business with something over $2,000,000.00 in cash and other liquid assets, but with an indebtedness of $2,500,000.00. At the time the exchange of the stock for the bonds was under discussion defendant's directors "were not altogether agreed upon the matter" until a bond in the penalty of $100,000.00 was executed by John T. Davis and his sister Mrs. Hallie D. Elkins, to the trust company indemnifying it against loss by reason of the transaction. John T. Davis is the father of the plaintiffs and chairman of the board of directors of the trustee. He had owned stock in the colliery company of the par value of $1,000,000.00 for which he had "hoped" to obtain cash, but for which he had been compelled to accept preferred stock in the West Virginia Company of the par value of $800,000.00. He was indebted to the trust company at the time of the exchange. He owed "a good deal of money". Shortly thereafter he sold $100,000.00 of the bonds at from 96 to 98. What he did with the proceeds of that sale does not appear, but he put up the remaining $139,000.00 of the bonds as security on notes.

Hallie and Henry Davis became of age respectively in 1920 and 1923. As they attained their majorities, each was presented by the trustee with a paper confirming the exchange, which each signed. Dividends were paid by the West Virginia Coal & Coke Company from 1918 until 1925, since when the company has been in bad financial condition. This suit was instituted in February, 1927. Its purpose is to have the exchange of the bonds for the stock declared a breach of the trust, to have the trust company account to the plaintiffs

232

for the bonds, and to have another trustee appointed in place of the defendant.

The defendant contends that the suit should not be maintained, because (1) the exchange was proper and legal; (2) the plaintiffs confirmed it; and (3) the plaintiffs are guilty of laches.

1. The motive given for the exchange by the trustee is that after payment of taxes, the bonds would net only about two per cent, while the stock would bring the children a greater income. The testator was an experienced financier and undoubtedly knew just what the bonds would net; yet he made no provision for their sale or exchange. The will clearly indicates his intention that the bonds should be held by the trustee throughout the continuation of the trust and distributed as such to the beneficiaries if not paid before the trust expired. He obviously desired the income of his grand-children to be safe rather than considerable. He owned 8,000 shares of stock in the Colliery Company. The fact that he devised Hallie and Henry the bonds instead of that stock is significant. The bonds were safe and had a greater market value at the time of the exchange than at the death of the testator. There is nothing to show that the children needed a larger income than the bonds would have supplied. No emergency had arisen which would have excused a departure from the wishes of the testator. It was the plain duty of the trustee to have conformed strictly to his plan. Pom. Eq. Juris., (4th ed.), sec. 1062; Perry on Trusts, (6th ed.), sec. 452; Hogg's Eq. Principles, sec. 572, p. 761. Even if we treat the transaction as a sale in anticipation of the maturity of the bonds and a purchase of the stock, we cannot justify it. The authorities uniformly agree that except where expressly authorized by the creator of the trust or by statute, the general rule is that trust funds can not be invested in stocks of private corporations. 39 Cyc. p. 401; McKinney, Liability of Trustees, p. 11; 26 R. C. L., p. 1309, sec. 162; Pomeroy, *supra,* sec. 1074, p. 2461. The better considered cases in jurisdictions where such investments are permitted admonish the trustee that the preservation of the trust fund is his paramount duty, to which his concern for a substantial return

must be subordinated; that he should not hazard the safety of the principal under any temptation to make extraordinary profits; that he should invest in the stock of a corporation only when the stock has a market value based on an actual and regular income and not upon contingencies, and the corporation has acquired by reason of the value of its property and prudent management for a considerable period of time such a reputation for permanence and stability that cautious and intelligent persons commonly invest their own money in the stock as a permanent investment; and that his diligence and sound judgment in making such an investment will be subjected to a *searching inquiry* by a court of equity. *Dickenson Appeal,* 152 Mass. 184, 187-8; *Kimball* v. *Reding,* 31 N. H. 352, 374. *In re Buhls Estate,* 211 Mich. 124, 12 A. L. R. 569. The trust company did not act in this transaction with even the care required under the more liberal doctrine. The future management, production and income of the West Virginia Coal & Coke Company was entirely problematical in 1917. Its income depended on contingencies. It is true that the reorganization of the Davis Colliery Company had launched an argosy of bright hopes. The officers of the trust company took a roseate view of its future at that time. They all "felt" that it was "a good prospect". But when pressed on cross-examination, N. I. Hall, who was the treasurer of the trust company in 1917, declined to say whether he would have invested cash in the coal company at that time. It is not shown that any cautious and intelligent person sought the stock as an investment. John T. Davis admits that he never had an offer to purchase the stock, and Hall knew of no sales thereof. The Davis interests did not voluntarily acquire the stock; it was thrust upon them by the syndicate which reorganized the Colliery Company. "We accepted the stock", says Hall, "because we had no other option." The exchange was suggested and even "urged" by John T. Davis, according to Hall, who states that the trust company had never on its own initiative purchased any coal company stock with a trust fund. It must have realized that the exchange was hazardous, otherwise why did it require of John T. Davis the indemnifying bond?

234

The defendant says that the optimism of 1917 establishes. its good faith, and invokes the rule that nothing more should be required of a trustee than good faith, and the same prudence and discretion that a prudent man exercises in the management of his own affairs. If the good faith of the trustee be admitted, where is the prudence and discretion required by the rule? Where is the prudent man who was willing at that time to invest his entire fortune in this stock? That rule contemplates facts, as well as faith. The inquiry should be not only will an enterprise be profitable, but has it proven so? "This necessarily excludes all speculation." *King* v. *Talbot*, 40 N. Y. 76, 86. 26 R. C. L., p. 1307, sec. 160; 39 Cyc., pp. 390-1; Pomeroy, *supra,* sec. 1074, pp. 2459, 2460. The prudence and discretion exacted by the rule is that of the investor, not the speculator; is that of the man seeking safety for his principal, and not that of the one who out of his abundance can afford "to take a chance" with a modicum of his substance. "Future events are from their very nature not definitely forseeable, and a prudent man has a perfect right to venture his own money on a calculation of business chances; all fortunes are accumulated by the exercise of just that sort of very common prudence. But with a trustee the case is different; he has all the knowledge, foresight and judgment of the business man; but the money to invest is not his own but belongs to others; it is his plain duty, if he would safely keep it, to minimize risks. He is not bound to have more prudence than the other, but he must utilize his, in avoiding risks which the one who owes no duty to others is free to take. In the one case, in view of probable favorable results, prudence says, 'Take the risk;' in the other, in view of very possible disaster, prudence says. 'Take not the risk." Common skill and common prudence, as is said in the many cases cited, are all that the law demands of a trustee; that is, the common skill and prudence of an investor of money to be safely kept with such reasonable income as is commensurate with safety of the principal." *Hart's Estate*, 203 Pa. 480, 485-6.

2. Equity regards transactions between the trustee and the *cestui que trust* ("a barbarous foreign idiom") with a watch-

ful and suspicious eye. Story Eq. Juris. (14th ed.) 443-445; 39 Cyc. 300-1. And while a beneficiary may confirm a breach of trust by his trustee, in order for the confirmation to be effectual it must appear affirmatively, among other things, that he had full knowledge of the facts constituting the breach and was advised of his legal rights thereunder. Perry, *supra,* sec. 851; Lewin on Trusts, Vol. 2, p. 1242-3; Pomeroy, *supra,* sec. 1083; 26 R. C. L., p. 1311, sec. 165. Hallie's information at the time she signed "the receipt" consisted of a statement to her in 1918 by her father that "he had made an exchange of stock for the bonds at a great sacrifice to himself—that the stock was worth a great deal more, and that it was to save the tax in West Virginia." Henry says, "Sometime during 1917 my father told me that the stock of the West Virginia Coal & Coke Company had been substituted for the bonds we should have gotten under the will and that he was doing this as a favor to Hallie and me, and making up the difference between the value of the bonds and the stock, and that he did this for the reason that the bonds would have been taxable at 2 or 3 per cent, and that the stocks were non-taxable." He further says that Mrs. Elkins told him in 1920 (or maybe 1922) that she had signed some paper "pertaining to us children", but that she did not tell him its contents or purposes. John T. Davis says he informed his children of the exchange and the reason therefor at the time it was made, and told Henry that instead of getting about three thousand dollars a year income, he would get six, that the stock was better security, that the coal company at the time was making large earnings, and that it had a great area of coal lands as its backbone. The confirmation by each beneficiary appears in a paper which was prepared by the trustee and called "a receipt". The instrument acknowledges receipt of the coal company stock certificate, briefly recites that the will of the grandfather provided that the trustee had the power to invest the proceeds of the railway company bonds in other safe interest bearing securities, *that the trustee had done so in acquiring the coal company stock,* and ratifies that acquisition. The foregoing is all the information as to the exchange favorable to defendant which the record shows the plaintiffs

had when they signed "the receipts". When Henry received the "receipt" from the trust company, he wrote Mr. Hall requesting a conference before signing it. He then came to Elkins where he executed the paper. Defendant's brief asserts broadly that while at Elkins, Henry "went over these transactions fully", with Hall and R. S. Irons (the personal attorney of John Davis). It is true that Henry did discuss with Hall and Irons the affairs of the Coal Company *as of that date,* together with his own personal transactions with his father and his trustee. No witness claims, however, that the exchange or conditions existing at the time of the exchange were discussed, and Irons says that no "legal phases of the matter" were mentioned. The defendant's brief also emphasizes the fact that Hallie's husband was associated with a brokerage house which handled bonds and securities. It supposes that he was consulted by Hallie as to the exchange, and that he was in position to give and did give her expert advice thereon. John Davis admits he never discussed "the subject of values—that is market values" of the stock and bonds with Hallie. Without information as to the comparative values of the stock and bonds, how could Hallie's husband have formed any correct idea as to the propriety of the exchange even had he been a bond expert? The record shows, however, that he was merely *taking a course in accounting* with the brokerage company at the time Hallie received the "receipt". We can hardly infer that as an accountant he was an expert on the exchange of stocks and bonds.

A comparison of the information which the plaintiffs had with the facts surrounding the exchange, shows several material circumstances which were not communicated to them. They were not informed

> (a) in detail of the financial history of the coal company;
> (b) that there was no market for the stock;
> (c) that the bonds were marketable;
> (d) that the exchange was made before the bonds matured and in violation of their grandfather's bequest;
> (e) that John Davis was indebted to the trust company.

(f) that he had been compelled to accept the stock when he needed cash;

(g) that the exchange was *urged* by him;

(h) that the stock for which the bonds were exchanged was his stock;

(i) that he forthwith made use of at least a part of the bonds to bolster his credit;

(j) that no other like exchange was made by the trust company;

(k) that an indemnifying bond was given by John Davis to the trust company to obviate objections to the exchange.

It is therefore obvious that they did not have the *full information* which the law requires, and the circuit court was plainly wrong in holding that they "were in possession of all the facts, and knew their legal rights at the time of signing these receipts." They had no information whatsoever tending to warn them that the value of the coal stock was entirely speculative on April 1, 1917, or which would have made them even question their father's representation that it was a better security than the bonds. They were in no position to exercise an individual business judgment on the comparative values of the stock and the bonds, or to decide whether the exchange was made in their interest or in the interest of John Davis and his creditor, their own trustee. Underhill on Trusts and Trustees, 7th ed., 497-8, says that in order for a release to cover a known breach of trust, it "must contain recitals showing fully and precisely the circumstances under which the breach took place * * * and that such circumstances did in fact amount to a breach of trust." If that requirement be considered too technical, it must nevertheless appear that the beneficiary possessed that information. *Knight* v. *Watts,* 26 W. Va. 175, 212. "Confirmation and ratification imply to legal minds, knowledge of a defect in the act to be confirmed, and of the right to reject or ratify it. The *cestui que trust* must therefore not only have been acquainted with the facts, but apprised of the law, and how these facts would be dealt with by a court of equity. All that is implied in the act of ratification, when set up in equity by a trustee against his *cestui que trust,* moved be proved, and will not be assumed.

The maxim *'ignorantia legis excusat neminem,'* cannot be invoked in such a case. The *cestui que trust* must be shown to have been apprised of his legal rights." *Adair* v. *Brimmer*, 74 N. Y. 539, 554; *Beeson* v. *Beeson*, 9 Pa. St. 279, 300; Pomeroy, *supra*, 965, p. 2092; *Brundy* v. *Canby*, 50 Mont. 454, 479. Defendant's brief admits that the beneficiaries were not so apprised as far as the record shows, and protests much at the requirement. It asserts that if a trustee "must advise the beneficiary of his legal rights (in the sense that the trustee must advise the beneficiary that he has a right to repudiate the action of the trustee in handling the fund), then it is absolutely impossible to conceive any state of facts whereby a trustee can settle a trust fund with a *cestui que trust* and end its liabilities or stop future litigation." Why the very way for a trustee to end liability or hasten litigation in such case, is to comply with this requirement. Then if the beneficiary fails to act, the law will imply a ratification after the lapse of a reasonable time. A fiduciary must seek to fill his position competently. In order to do so, he should "possess such legal knowledge as is needful to the proper execution of the trust." *Durett* v. *Commonwealth*, 90 Ky. 312, 318. The transmission of that knowledge to his beneficiary is a simple sequence. But the brief complains that "the confession of error would put the *cestui que trust* in possession of all the evidence that he would need to win a suit against the trustee for breach of trust." If error be made, it is to the advantage of the trustee to confess. The error may be forgiven. But if not, he is in no worse position than he will be eventually when the error is discovered, as equity will not permit him to profit by his concealment. The brief again says, "Obviously the trustee could not have told them that it had committed a breach of trust, because it honestly believed that it had not committed a breach of trust." If the trustee with all the facts before it did not know the effect of its acts, why attempt to charge the beneficiaries with such knowledge upon their meager information? If the trustee had no such belief, then it certainly did not contemplate that the receipts were releasing it from a breach. A significance should not now

be given the receipts, which was not intended by either the trustee in preparing or the beneficiaries in signing them.

Defendant further contends that the failure of the plaintiffs to return the difference between the dividends which they received from the stock and the amount which they would have received from the bonds, constitutes a ratification of the exchange. That failure is not an *indicium* of confirmation. There are several years in which the plaintiffs have received no dividends from the stock. Yet it was the duty of the trustee to secure, and the right of the plaintiffs to receive, a fair return on the principal over the entire period of the trust. If plaintiffs have received from the stock a greater return than would have been realized from the railway bonds *and from a proper investment of the proceeds of those bonds after maturity in government bonds or other safe interest bearing securities,* such greater return can be given consideration upon the accounting. The very prayer of plaintiffs for an accounting implies the possibility that the defendant might be entitled to a credit against their demands, otherwise the prayer would have been for a definite sum. We cannot assume in advance of an accounting, however, that such a credit is justified.

3. The defendant contends that even if the beneficiaries did not know the circumstances surrounding the exchange, they are chargeable with what information they might have obtained had they used reasonable diligence to do so, and that acquiescence is implied. Hallie was a wife and a mother when she attained her majority. She devoted her attention to her duties as such with little thought of business. Henry continued at college after he was twenty-one, and his attention is shown to have been seriously fixed on his studies and not on business. Both were without business experience. All of these facts were well known to defendant. The information the beneficiaries possessed prior to 1925 as to the exchange had been given them by their own father. He had assured them that the exchange was to their advantage. They accepted his representations. They had implicit trust in their "grandfather's bank", as Henry called the trust company. Its officers were their personal friends. Reliance on both the father

and the trustee were natural and proper. Why doubt the father? Why mistrust the bank? Why make inquiries? Nothing had occurred to disturb their confidence. The law does not require confidence to engender suspicion. Consequently, they were not negligent in failing to investigate. "If there is nothing to excite suspicion and no apparent reason for making investigation, a person is not negligent in failing to make inquiry." 21 C. J. 248. *Santa Marina Co.* v. *Bank*, 242 Fed. 142, 149. They had the right to assume that the trustee had properly executed the trust. "It must appear that the *cestui que trust* has knowledge of the breach of trust. He has a right to presume that the trustee is acting in good faith in the execution of the trust, and he is not bound to institute an inquiry in regard to the acts of the trustee." Beach on Trusts and Trustees, sec. 696, p. 1595. Perry, *supra,* sec. 850; Lewin, *supra,* p. 1238 (*923), sec. 3. Until the dividends stopped in 1925, the beneficiaries had acquired little, if any more information about the exchange than they possessed upon coming of age. They were still ignorant that the trust had been breached. "The *cestui que trust* can give a legal acquiescence only as * * * he understands the legal force and effect of his act." Beach, *supra,* sec. 695, p. 1591; Pomeroy, *supra,* sec. 965, p.2092-3-4; McKinney, *supra,* sec. 10, p. 6; 39 Cyc. p. 413, 414; 26 R. C. L., p. 1311. The duty of the trust company to make to the beneficiaries full disclosures of the circumstances surrounding the exchange did not cease when the receipts were obtained. It was an absolute and continuing duty. That of the beneficiaries to seek information was a contingent duty. The trustee is therefore primarily responsible for the ignorance of the beneficiaries prior to 1925. Logic does not countenance the contention that the omission of a secondary duty by one excuses neglect of a primary duty by another. *Macomber* v. *Kinney*, 114 Minn. 146, 154.

When cessation of dividends in 1925 caused the beneficiaries to make inquiry, the trust company did not facilitate their investigation. Henry states that Mr. Wilson, who was then defendant's president, "would not answer letters". They did not learn the real circumstances of the exchange and the

true character of the indemnifying bond until the fall of 1926. The delay in 1925 and 1926 is attributable to the failure of the trust company to furnish this information promptly.

The defendant places especial reliance on *Hoyt* v. *Sprague,* 103 U. S. 613, which denied a beneficiary relief after seven years' delay, on the theory that "the world must move, and it is to the interest of the community that controversies should end." This ruling is, of course, based on the maxim, *"expedit reipublicae ut sit finis litium."* We concede the importance of expediting litigation; but are also of opinion that it is of major consequence to communities that fiduciaries be held to a faithful performance of their trust.

Defendant also cites *Kelly* v. *McQuinn,* 42 W. Va. 774, as "a striking parallel to the case here." There the ward participated, with full knowledge, in the transaction which he later sought to avoid. In that case as well as in *Hoyt* v. *Sprague, supra,* the facts are not similar to the facts here. As Pomeroy so sapiently concludes, "Each case involving the defense of delay or lapse of time must to a great extent depend upon its own circumstances." Section 965, p. 2096. *Roush* v. *Griffith,* 65 W. Va. 752, pt. 7 syl.

This is an express trust. We have specifically held that while a "long lapse of time may bar relief to the beneficiary of an express trust, it must be so long and the circumstances such in character as to establish clearly a relinquishment or abandonment thereof, or a situation occasioned by the death of witnesses, loss of evidence or other matter in the nature of an estoppel, that will make it clearly inequitable and unjust to support it." *Roush* v. *Griffith, supra,* 763; *Campbell* v. *O'Neill,* 69 W. Va. 459. The circumstances connected with the delay after the beneficiaries became of age, forbid that this delay be considered such a "long lapse of time" as in itself will bar relief. The brief, however, insists that if the stock was speculative the beneficiaries chose to retain it and speculate with it, and says: "To allow this stock to be thrown back upon the trustee now, in the present situation of the coal industry would be grossly inequitable, and would practically make of the trustee a perpetual insurer of all its present and past trust investments." The will confers on the defendant

seventeen separate trusts of the railway bonds. The bonds of the plaintiffs were the *only* ones which defendant exchanged for coal company stock. Consequently, the argument as to the "perpetual insurer" of *all* trust investments is exceedingly wide of mark. The officers of this defendant are shown to have had experience with the coal industry over a long period of years. They necessarily knew of its fluctuations and vicissitudes. They did not impart this knowledge to their inexperienced beneficiaries. The retention of the coal company stock must have been known to the trust company to be speculative; but we cannot infer that it was so known to the beneficiaries. The trust was a continuing one, and it was the continuing duty of the trustee to inform the beneficiaries of the risks of the coal business and to use due care to extricate their patrimony from such a hazardous investment. *Thompson* v. *Finch,* 22 Beav. 316, 325, 52 Reprint 1130, 1133. Because the trustee failed to perform its duties, the responsibility for the retention as well as for the purchase of the stock must fall on the trustee. It is settled law that a trustee is personally liable for a breach of trust "by way of compensation or indemnification, which the beneficiary may enforce at his election." Pomeroy, *supra,* sec. 1080; Perry, *supra,* sec. 843; 39 Cyc. 414, 415; 26 R. C. L., p. 1324, sec. 187.

The ill-advised exchange of safe bonds for unsafe stock, and the subsequent indifference of the trustee to the perilous position of the trust fund, are ample grounds for the removal of the trustee. Pomeroy, *supra,* sec. 1086; 26 R. C. L., p. 1276, sec. 126; 39 Cyc. 261.

The plaintiffs are therefore entitled to the full relief prayed for. The judgment of the lower court is reversed and the cause remanded.

*Reversed and remanded.*