THOMAS ADAMS & Co., Limited, Appellant, *v.* NICHOLAS
     ALBERT, HENRY C. ALBERT and CHARLES HAAGER,
     Respondents.

1. PARTNERSHIP — UNLIQUIDATED INTEREST OF RETIRING PARTNER
LEFT IN BUSINESS. When a retiring partner allows his unliquidated
interest to be continued in the business of a new firm, the interest thus
left becomes liable for the partnership debts subsequently incurred, as
well as the prior debts, that is, the interest of the retiring partner still
remains at the risk of the business — although it may be that newly-
acquired assets, which in the course of business take the place of the
old, are subject to the lien of the new debts in preference to the old, and
that the old assets remaining in specie are subject to the old in preference
to the new debts.

2. INSOLVENT PARTNERSHIP — RIGHT OF CREDITOR IN ASSETS SUPERIOR
TO CLAIM OF RETIRED PARTNER FOR UNLIQUIDATED INTEREST LEFT IN
BUSINESS. A retired partner, who has allowed his unliquidated interest
in the old firm to be continued in the business of a new firm as capital,
and, hence, at the risk of the business, cannot, on the insolvency of the
new firm, assume the position of a firm creditor in virtue of that interest,
to the prejudice of actual creditors of the new firm ; and as between him
and an actual creditor, the latter has, in equity, the superior right to the
fund arising from the firm assets.

*Adams & Co.* v. *Albert*, 87 Hun, 471, reversed.

(Argued March 11, 1898 ; decided March 22, 1898.)

APPEAL from a judgment of the late General Term of the
Supreme Court in the first judicial department, entered June
26, 1895, affirming a judgment in favor of the defendant
Nicholas Albert against the plaintiff, entered upon a decision
of the court dismissing the complaint on trial at Special Term.

The nature of the action and the facts, so far as material,
are stated in the opinion.

*W. W. MacFarland* for appellant. By a settled rule of
equity, as well as by intention and express dedication, the
unliquidated interest of Nicholas Albert remaining in the busi-
ness was at the risk of the business, and the rights of Nicholas
were subordinate to the rights of creditors of the new, as well
as of the old, firm. He had no interest in the assets as against

creditors of the new firm.   (2 Bell's Comm. 500, 501, 507;
Lindley on Part. 1041; *Willis* v. *Sharp*, 113 N. Y. 586; *Bur-
well* v. *Mandeville*, 2 How. [U. S.] 560; *Hoyt* v. *Sprague*,
103 U. S. 613; *Nerot* v. *Burnand*, 4 Russ. 247; *Payne* v.
*Hornby*, 25 Beav. 280; 4 Jur. [N. S.] 446; *People ex rel.* v.
*Van Buren*, 136 N. Y. 252.)   The application of the prin-
ciples of equity stated above must lead to a reversal of the
judgment.   (*Peyser* v. *Myers*, 135 N. Y. 599; *Baily* v.
*Hornthal*, 154 N. Y. 648; *White* v. *Benjamin*, 150 N. Y.
258; *Barker* v. *C. P., N. & E. R. R. R. Co.*, 151 N. Y. 237;
*Wilson* v. *Robertson*, 21 N. Y. 587; *Menagh* v. *Whitwell*, 52
N. Y. 146; *Curran* v. *Arkansas*, 15 How. [U. S.] 304;
Greenl. on Ev. §§ 105, 112.)   The rule of equitable estoppel
is decisive in plaintiff's favor.   (*White* v. *Hoyt*, 73 N. Y. 505;
*Continental Nat. Bank* v. *Nat. Bank of Comm.*, 50 N. Y.
575; *Grissler* v. *Powers*, 81 N. Y. 57; *Thompson* v. *Simp-
son*, 128 N. Y. 270; *N. Y. R. Co.* v. *Rothery*, 107 N. Y.
310; Pars. on Part. 495; Pollock on Part. 23, 24; Lindley
on Part. 47–54.) . The legal relation of Nicholas to the action
is in point of form substantially that of a claimant of the pro-
ceeds of stolen goods, for the goods were all obtained by the
grossest fraud and falsehood.   And, moreover, Nicholas' posi-
tion is that of a naked claimant who has advanced nothing
on the strength of even a colorable title.   A person in that
situation has no standing in a court of equity.   (*A. S. R. Co.*
v. *Fancher*, 145 N. Y. 552; *Amherst College* v. *Ritch*, 151
N. Y. 328.)

*James L. Bishop* and *Rudolph F. Rabe* for respondent
Nicholas Albert.   Every disputed question of fact necessary
to support the conclusion of law must be deemed to have been
found by the trial court, and this court is without jurisdic-
tion to review such findings.   (*People ex rel.* v. *Barker*, 152
N. Y. 431; *Bomeisler* v. *Forster*, 154 N. Y. 237; *Baily* v.
*Hornthal*, 154 N. Y. 648; *Amherst College* v. *Ritch*, 151 N.
Y. 282.)   The firm of Albert, Haager & Waldburger was
indebted to Nicholas Albert in the sum of upwards of $50,000.

An account stated between the parties was, in the absence of the claim of any then existing creditor, and in the absence of any proof of fraud or mistake, binding upon the parties, and what took place at the formation of the new firm was, in substance and effect, the statement of an account. ( *Wahl* v. *Barnum*, 116 N. Y. 87; *Sayward* v. *Dexter*, 72 Fed. Rep. 758, 768; Lindley on Part. 512; Story on Part. § 206; *Penn Bank* v. *Furness*, 114 U. S. 376; *Willis* v. *Sharp*, 113 N. Y. 586; *Burwell* v. *Mandeville*, 2 How. [U. S.] 560; *Hoyt* v. *Sprague*, 103 U. S. 613.) The defendant Nicholas Albert is not estopped to maintain that he has the better right to the fund in question. ( *Continental Nat. Bank* v. *Nat. Bank of Comm.*, 50 N. Y. 575; *Allen* v. *Rundell*, 50 Conn. 9; *Jackson* v. *Allen*, 120 Mass. 64; *Langdon* v. *Doud*, 10 Allen, 433; *Turnispeed* v. *Hudson*, 50 Miss. 429; *Allen* v. *Hodge*, 51 Vt. 392; *Barnes* v. *Star*, 64 Conn. 136; *Lawrence University* v. *Smith*, 32 Wis. 587; *Hefner* v. *Vandolah*, 57 Ill. 52; *H. M. Co.* v. *Farrington*, 82 N. Y. 121.)

O'Brien, J. The sole question in this case is one of equitable priority. The controversy is between the plaintiff and the defendant Nicholas Albert, each claiming the prior right to a fund in court which represents the proceeds of a stock of goods that on December 23rd, 1893, was owned by the firm of Albert, Haager & Company. That firm was composed of Henry Albert and Charles Haager, and on the day last mentioned was, and for some time had been, utterly insolvent. On that day Henry Albert confessed an individual judgment to his father, Nicholas, for $50,000. On the 28th of December he confessed an individual judgment to the plaintiff for about $40,000. Executions were promptly issued upon both judgments to the sheriff and levies made upon the firm goods, that in favor of Nicholas being, of course, prior in point of time. The plaintiff, however, has claimed from the beginning that its debt, by reason of the facts and circumstances hereafter disclosed, had the prior and superior right. In order to avoid a sacrifice of the goods they were sold in

due course of business under a written agreement of the par-
ties, and the proceeds deposited to await the result of this
action, which the agreement contemplated and provided for.

While both parties claim to be prior creditors, the judg-
ments, as we have seen, are not against the firm, but against
one of its individual members. This seems to have occurred
from the mistaken notion that the other partner had retired
on the 1st of January previous to the failure and that the
defendant in the judgments had assumed all the firm debts
and had acquired all the firm property. But such was not
the fact as clearly appears in this case. The firm expired by
limitation on January 1st previous to the failure, but there
was no actual dissolution, and both partners, in fact, continued
as before in the business. The title to the firm property was
not changed, and there was no assumption by either partner of
the firm debts. In this situation the individual judgments
against Henry became liens only on his individual interest in
the firm assets, and as the firm was hopelessly insolvent, that
interest was nothing at all.

. We cannot, therefore, perceive how these judgments or
executions play any material part in the controversy. Both
parties are remitted to their original rights or claims against
the firm property. They stand now in that respect where
they stood before the judgments were entered. The party
that then had the superior lien in equity upon the goods, if
either, has now the superior right to the proceeds or fund that
represents them. That fund is in court, and the purpose of
this action is to determine and adjust the conflicting claims of
the parties in law or equity. The written stipulation is broad
in its scope and purpose, and requires the court to look beyond
the judgments and determine what the equities of the respec-
tive parties were as against the firm property. Neither party
has gained nor lost any right or advantage in consequence of
the recovery of the judgments or the levies made under them
by the sheriff. The case is controlled by principles of equity
founded upon the law of partnership in the marshalling of the
firm assets and the adjustment of the claims of partnership

creditors. In order to apply these principles it is necessary to state some antecedent facts that appear in the case and that are undisputed.

The plaintiff is an English corporation engaged in the manufacture and sale of lace goods at Nottingham. The defendant Nicholas Albert came to this country from Europe about 1854. In 1867 he became a member of a firm in New York that was largely engaged in dealing in lace goods. When that firm was dissolved two years later, he formed a partnership with two other persons in the same business. This firm was dissolved December 31st, 1885, and he retired from business, and soon afterwards went to reside at or near St. Gall, in Switzerland, where he has since resided. His son Henry took his place in the firm, the other two members being the same persons who were in the firm when the father retired. The same private ledger that had been used by the old firms was continued by the new firm, in which the partners' capital account was entered. When Nicholas retired and the new firm was formed on the 1st day of January, 1886, his nominal interest in the business, as appears from this book, was $115,000, but the business of the old firm was never wound up by any settlement or actual liquidation. This interest was ascertained by deducting the debts of the firm from the nominal assets. What his interest would have been upon an actual liquidation cannot now be known, and never was known with anything like accuracy.

But whatever it was it remained with the new firm. All that was done upon the retirement of Nicholas was to make certain entries in the ledger referred to, containing the capital account, by which it was made to appear that the son had an individual interest in the new firm of $50,000, and the firm itself the balance of the father's interest. The father took no obligation or promise of any kind from the son or from the firm, and none was created otherwise than by the entry on the ledger. It cannot be doubted that it was the interest thus left by Nicholas in the business that gave and was intended to give the new firm, of which the son was the head, credit and stand-

ing in the business world. The plaintiff had considerable dealings with the old firms and continued to supply the new firm with a large part of their stock, which was always purchased on credit. The name of the new firm was the same as that of the old. In 1888 one of the members of the new firm dropped out, and this left the son and the other partner the sole members of the new firm, but no other change was made.

The interest of Nicholas still remained in the business, he receiving in each year payments or credits of various sums of money, representing sometimes six per cent and sometimes five per cent on what he left with the firm. This, with some other comparatively small amounts, was the only money that he ever drew from the business. After the retirement of the father the business was not prosperous. The new firm, especially in later years, was continually behind in their payments to the plaintiff, upon whose forbearance and credit the success of the firm largely depended. In July, 1891, the firm was indebted to the plaintiff in the sum of about $50,000 for goods.

The managing director, feeling anxious and uncertain about the safety of this debt and the condition of the firm, visited Nicholas, the father, at his home near St. Gall. The condition of the firm with reference to its ability to pay, and the propriety and safety of extending future credits, was the subject of their interview. The father then gave to the plaintiff's agent assurances which not only resulted in forbearance as to the debt due, but further credit. They differ somewhat now with respect to what these assurances were, but for all the purposes of the case they may be here stated in the language of the findings of the learned trial judge dismissing the plaintiff's complaint, and which are based upon the testimony of Nicholas himself.

He finds that Nicholas said to the plaintiff's agent, " You need not have any fear at all. That is all right. Your firm won't lose anything because, as much as I know, the business over there is good, and I have over $100,000 capital in the

business; $50,000 is a loan to my son, and the remaining part to the firm, so you need not be afraid at all; that is all right." This statement seems to have satisfied the plaintiff's agent, and he not only allowed the debt to remain in the condition that it then was, but he continued to give credit to the firm to the end and to sell them goods on the faith of the statement, and when the son confessed the judgment already mentioned to his father, which put an end to the business, a large part of the assets of the firm consisted of the very goods sold to them by the plaintiff on credit, and hence a large part of the fund in controversy is traced to the plaintiff's goods, sold in the manner described.

The son, Henry, was present at the interview at St. Gall, and participated in it. The plaintiff's agent says that the father asked his son to put the substance of the interview in writing, but this the father denies. However that may be, it is undisputed that on the same day the son delivered to the agent a letter, under his own signature, in which he referred " to our conversation of to-day," and wishing to set the agent's mind at ease with respect to his debt, he proceeded to state that his father had a capital of about $100,000 in the business, half of which was at the business risk and the balance loaned to him, and that the agent could rest assured that he would be paid in full before any of this capital should be withdrawn. That Henry, in behalf of his firm in New York, did give to the agent in various forms the most explicit assurances that the father's interest was at the risk of the business is not disputed, but since the courts below have held that the father was not bound by them the case may rest on his own version of the transaction as found by the learned trial judge.

In giving to this interview its proper significance not much importance can be attached to the use of the word *loan*. All that Nicholas could have meant by that, as we shall see hereafter, was to describe the manner in which his interest in the old firm had been distributed in the capital account of the new firm. The important fact was that his interest still remained in the concern *as capital* to give it strength and

1898.]   Adams & Co. *v.* Albert.   363

N. Y. Rep.]  Opinion of the Court, per O'Brien, J.

credit. He certainly could not have intended the plaintiff's agent to understand that he, Nicholas, had a debt against the firm and against his son for over $100,000, that he was at liberty to enforce at any time. Such a situation, instead of removing the agent's doubts and fears with respect to the financial condition of the firm, might well have aroused his worst apprehensions. That the agent did not understand the situation in that way is too plain for argument, when we consider the purpose of the interview, the substance of what took place and what followed. That Nicholas did not intend to be understood in that sense is equally clear, since he knew that the agent had doubts with respect to the ability of the firm to pay its debts, and to reveal to his mind such a dangerous situation would aggravate his fears instead of dispelling them.

Hence, the question is whether, upon such a state of facts, Nicholas can now assume, with respect to this fund, the attitude of a preferred creditor against all the other creditors of the firm, and especially against the plaintiff, who, upon the faith of all these assurances, parted with the legal title to the property which the firm had at the time of the failure, and which is represented by the fund in question. The solution of this problem does not call for any discussion of the question of fraud, actual or constructive, but depends upon principles of equity. It is proper, however, to say that, while there is in the record abundant material for imputing fraud to Henry, the son, and the firm for which he acted, there is no reason whatever to suppose that Nicholas, his father, was in any way connected with it. Even in the interview at St. Gall, already described, he acted honestly and doubtless meant just what his words fairly implied. He was, as all now admit, deceived as to the condition of the business in New York by his son. He had no hand nor part in procuring the judgment under which he now claims, and, in fact, he knew nothing about it until after it was entered. The plan of confessing judgment and acquiring a first lien on the property of the firm was conceived and executed by the son alone. It is true that he is now in the attitude of claiming the benefit and advantage.

of that judgment, but it is quite probable that he has been made to assume that position by the voluntary action of his son.

Therefore, leaving entirely out of view all questions of actual fraud, and relegating the judgments to their proper place in the controversy as merely representing the debts in another form, we have simply two claimants of a fund which is subject to the disposition of a court of equity on equitable principles, and the question is, which of the two claimants has the superior right in equity?

When Nicholas retired from the firm on the 1st of January, 1886, leaving his entire unliquidated interest in it as capital, it remained at the risk of the business, and his rights in the firm property thereafter became subordinate to the rights of creditors of the new firm as well as the old firm, and this without regard to the manner in which by his assent, express or implied, that interest was distributed on the book containing the account of capital. On the undisputed facts disclosed by this case, he cannot, upon failure of the new firm, assert any interest in the firm assets to the prejudice of creditors. The nominal capital, which Nicholas, the father, left in the concern, however distributed upon the books, was the thing which gave and was intended to give standing and credit to the new firm, and hence it would now be inequitable to deprive the firm creditors of the benefit of it in favor of the party who furnished it, or rather allowed it to remain for the purpose of promoting the success of a business in which his son was largely interested. That son took his father's place in the firm, and, without even a change of name, it continued the same business substantially upon the credit and reputation which the still unascertained and unliquidated interest of the father gave to it. The money value of the interest of the retiring partner depended upon what that interest would produce when reduced to money, after the discharge of all debts, and it was never ascertained by that process. The facts in the record indicate that had that course been pursued the real interest would prove to be much less than the nominal interest. To allow the retiring partner now, when the new firm

has failed, to give to his nominal interest, left in the business.
in the manner and under the circumstances stated, the form
and character of a fixed debt against the new firm to the
exclusion of the plaintiff's claim, would be, to use a very mild
expression, contrary to equity.

The principle to be deduced from the elementary books and
the adjudged cases, which applies to such a situation as the
facts in this case disclose, is substantially this: When a retir-
ing partner allows his unliquidated interest to be continued in
the business of a new firm, the interest thus left becomes liable
for the partnership debts subsequently incurred, as well as the
prior debts.  It may be that newly-acquired assets, which, in
the course of business take the place of the old, are subject to
the lien of the new debts in preference to the old, and that
the old assets remaining in specie are subject to the old in pref-
erence to the new debts, but with this qualification the rule
seems to be well settled in equity, and that is but another way
of saying that the interest of the retiring partner still remains
at the risk of the business.  ( *Willis* v. *Sharp*, 113 N. Y. 586 ;
*Burwell* v. *Mandeville's Exrs.*, 2 How. [U. S.] 560 ; *Hoyt* v.
*Sprague*, 103 U. S. 613 ; *Nerot* v. *Burnand*, 4 Russ. 247 ;
*Payne* v. *Hornby*, 25 Beav. 280 ; Lindley on Part. 700, 702.)

The principle is stated in this form by a learned writer on
the Law of Partnership : " If, therefore, the person, instead of
permitting himself to be held out as a partner, permits his
property to be held out as the property of the firm, and as
forming a part of the foundation on which its credit rests, the
very same reason which held him personally in the first case
with all his property, would now hold that part of his prop-
erty so permitted to appear as the property of the firm."
(Parsons on Partnership [3d ed.], 537.)   That must mean that
the interest of the retiring partner, set over on the books to
the new firm, is continued at the risk of the business.   Hence
.the result must be that, as against the plaintiff, the defendant
-Nicholas Albert cannot now assume the position of a firm
creditor in virtue of his nominal interest in the old firm, but
left by him for the use of the new firm as capital.   This would

deplete the assets of the insolvent firm to which he intrusted his interest on retiring from the old firm or upon its dissolution, to the prejudice of the just rights of creditors, a consequence which equity does not tolerate. (*Baily* v. *Hornthal,* 154 N. Y. 648.)

The application of this principle is decisive of the case, and while it might be developed and illustrated at greater length by discussion and by reference to other authorities, enough has been said to indicate and make reasonably clear our reasons for the conclusion that the plaintiff has in equity the superior right to the fund which is the subject of litigation. In this view of the case it is not important to determine whether the interview between the plaintiff's agent and Nicholas, at St. Gall, in July, 1891, with what followed, constitutes a technical estoppel, since the principle of equity, to which attention has been directed, would apply if that interview had never taken place. But it has an important bearing upon another feature of the case, and gives great aid in the application of the principle.

Whatever else that event may prove or tend to prove it shows quite clearly that Nicholas then and all along understood the situation just as equity now views it under the rule and principle stated. If, on the 1st day of January, 1886, he became, as now claimed, a creditor of the firm and of his son to the extent of his nominal interest of $115,000, then it would be apparent that the new firm started in business with practically no capital at all since a liquidation of the assets would barely pay the debts. Indeed, if that was the real situation, the firm was perilously near insolvency from the beginning, and that situation did not improve from the date of the organization to July, 1891, when the interview at St. Gall took place. On the contrary, everything tends to show that it was aggravated, and hence if Nicholas then had this large debt against the concern, which he was at liberty to enforce at pleasure, he could not as an honest man have told the plaintiff's agent, as he did in substance, that the plaintiff's debt was not only safe but that the agent could safely con-

tinue to give further credit. He evidently understood then, as equity now regards it, that his unliquidated interest, whatever it might be, was at the risk of the business, and so regarding the nature of his claim, his conduct is consistent with the highest standard of commercial morality, but upon no other hypothesis can his acts and words be reconciled with that honesty of purpose which is now freely conceded to him on all sides. His present position, which it is but just to say was not of his own seeking, but brought about by the voluntary action of his son, would seem to invite a conflict between his personal reputation for integrity as a business man and his pecuniary interest, since either the one or the other must suffer as the result of this case. The principle of equity, upon which our decision rests, preserves the former while it may unfavorably affect the latter.

There are no other questions in the case. It may be that the view we have taken with respect to the principle that governs the rights of the parties may give rise hereafter to some questions of practice or procedure, but they belong to the court of original jurisdiction.

The judgment should be reversed and a new trial granted, costs to abide the event.

All concur, except PARKER, Ch. J., not sitting, and VANN, J., dissenting.

Judgment reversed, etc.