HENDERSON et al. v. SHELL OIL CO.,
Inc., et al.

No. 14826.

Court of Civil Appeals of Texas.
Fort Worth.

April 25, 1947.

Rehearing Denied May 23, 1947.

J. Willard Gragg and Sanford, King, Estes & Cantwell, all of Dallas, for appellants.

Geo. W. Cunningham and Jesse M. Davis, both of Tulsa, Okl., and W. D. Masterson, Jr., and John E. Kilgore, both of Dallas, for appellee Shell Oil Co., Inc.

Stine, Bunting & Stine, of Henrietta, for appellee W. L. Mount.

McDONALD, Chief Justice.

Since prior to the year 1918 Hugh Henderson has owned a 220 acre tract of land in Clay County, Texas. During all of such time Henderson has been a person of unsound mind, and during all of such time he has resided in the State of Missouri. In 1918 the County Court of Clay County entered an order appointing M. L. Henderson, a brother of Hugh Henderson, as guardian of the latter's estate. M. L. Henderson resided in Clay County. In 1939 M. L. Henderson again applied to the same court for letters of guardianship, and again an order was entered appointing him guardian of such estate. Shortly afterwards the guardian, under order of the court, executed an oil and gas lease on said land in favor of the appellee Shell Oil Company, and also executed what we may call a conveyance of half the minerals in said land to the same

company. Shell drilled wells on the land, and has produced a large amount of oil therefrom.

In 1943 Hugh Henderson, by his next friend, filed an application for writ of certiorari in the District Court of Clay County, seeking a review and revision of the 1918 and the 1939 orders of the county court appointing a guardian, and the orders authorizing the oil and gas lease and the conveyance of half the minerals to Shell Oil Company. Article 932, Revised Civil Statutes, and Texas Rules 344 to 351, inclusive, Texas Rules of Civil Procedure. A contest over the the the question of who should act as next friend for Henderson was carried to the Supreme Court. Henderson v. Shell Oil Co., 143 Tex. 142, 182 S.W.2d 994.

A non jury trial of the certiorari proceeding in the district court resulted in a judgment which in effect confirmed the orders of the probate court and denied Henderson any relief. He has appealed, presenting five points of error. Appellees Shell Oil Company and the present guardian (M. L. Henderson having died during the pendency of the suit) have filed separate briefs, in each of which it is contended that the certiorari proceeding must be treated as a collateral attack on the probate proceedings because of lack of necessary parties. Since we have concluded that the probate orders are valid even as against a direct attack, we shall not undertake a decision of the question just mentioned, but for the purposes of this opinion shall treat the certiorari proceeding as a direct attack on the orders of the county court.

In 1918 M. L. Henderson made application to the County Court of Clay County for appointment as guardian of the estate of Hugh Henderson. In 1939 Shell Oil Company proposed to the guardian to purchase an oil and gas lease on the ward's land. Shell's attorneys recommended that a new order of appointment be obtained, on the ground, according to the testimony of one witness, that the 1918 order did not contain an express adjudication that Henderson was of unsound mind. M. L. Henderson again made application for appointment as guardian of said estate, and again was appointed as such. Notice of the 1918 application was given by publication in a local newspaper. Notice of the 1939 application was given by posting, and in addition a sort of nonresident notice was served on Hugh Henderson in Missouri. Both appointments are attacked on several grounds.

 First, it is contended that the Texas court had no jurisdiction to adjudge a resident of another state insane and to appoint a guardian of his estate. We overrule this contention. There is language in the opinion in Redmon v. Leach, Tex.Civ.App., 130 S.W.2d 873, writ dismissed, correct judgment, which supports appellant's contention. To the contrary, however, is the holding in Re Burges' Estate, Tex.Civ.App., 148 S.W. 2d 903. Article 4132, Revised Civil Statutes, provides among other things that a guardianship of the estate of a nonresident minor or person of unsound mind may be granted when such person has an estate located within the State of Texas and it is made to appear that a necessity exists for such guardianship. Redmon v. Leach declares that Art. 4132 is unconstitutional. In re Burges' Estate cites Redmon v. Leach, but refuses to follow the rule there announced, and declares that Art. 4132 is not unconstitutional, citing Hoyt v. Sprague, 103 U.S. 613, 26 L.Ed. 585, where the Supreme Court of the United States held that "there can be no doubt that the legislature of Rhode Island, where the property was situate, had power, first, to pass laws for the appointment of guardians of the property of nonresident infants, situate in that State; and secondly, it had power to prescribe the manner in which guardians shall perform their duties as regards the care, management, investment, and disposal of such property; and that this power is as full and complete as where the minors are domiciled in the State."

 Appellant argues that Missouri alone had jurisdiction to declare the status of Hugh Henderson, whether sane or insane. But it is to be remembered that Texas, and not Missouri, had jurisdiction over the property of Hugh Henderson which was located in Texas. Without a guardianship in Texas, there would have been no person competent to handle or dispose of the Texas property. Neither Hugh Henderson, nor a guardian appointed by

another state, could have sold the Texas land or leased it for oil and gas development. As said in Erwin v. Holliday, 131 Tex. 69, 112 S.W.2d 177, 178, "It is now definitely settled that the states possess exclusive jurisdiction over property situated within their territorial limits." To quote again from the same opinion, "Of course, in the accomplishment of such purposes, the courts cannot act directly upon the person of the nonresident owner or claimant, but upon the title or the property itself." The case just cited does not involve property belonging to an insane person, but the basic rule is the same, whether the nonresident property owner be sane or insane. In Neal v. Bartleson, 65 Tex. 478, our Supreme Court held that a Texas court had jurisdiction to appoint a guardian of the Texas estate of nonresident minors, even where there was no statute expressly authorizing such an appointment. The opinion declares: "In England and America, however the rule may be elsewhere, it is held, that the courts of the country in which property of a minor may be, to whom is confided the general power to appoint guardians and to administer minor's estates, have the power to appoint guardians of the estates of minors resident elsewhere and to control their estates." In Bouldin v. Miller, 87 Tex. 359, 28 S.W. 940, the minors were residents of California. It was contended that the Texas probate court had no authority to appoint a guardian or to order sale of land situated in Texas which belonged to the minors. The Supreme Court pointed out that the minors could dispose of their Texas land only through proceedings in a Texas probate court. In 44 C.J.S., Insane Persons, § 10, p. 60, it is said: "Guardianship of property of an insane person may be authorized where his residence and the property are within the territorial jurisdiction of the court; and, ordinarily, such a guardianship may be had although the insane person is a nonresident." A proceeding to commit an insane person, or to appoint a guardian of his person, is a proceeding in personam, but a proceeding to appoint a guardian of the estate of a nonresident is primarily a proceeding in rem, jurisdiction of which depends not on the residence of the insane person but on the location of the property.

Appellant argues that a different rule would apply to guardianship of the estate of an insane person than would apply to guardianship of the estate of a minor. We do not see that there would be such a difference. In either case the court has authority to act because the property lies within the jurisdiction of the court, and because the status of its owner is such that the court is empowered under the law to assume control of the property. As said above, Texas has exclusive jurisdiction of the land in Clay County. Through its constitution, Art. 5, Section 16, Vernon's Ann.St., Texas has vested in the county court jurisdiction of that land if its owner is a minor or a person of unsound mind, whether the owner resides within or without Texas. Neal v. Bartleson, supra. It is elemental that the Texas court, and the Texas court alone, has jurisdiction to inquire into and find the facts supporting its jurisdiction. A Texas court might in a proper case give full faith and credit to a judgment of a Missouri court adjudging Hugh Henderson to be an insane person, but still the ultimate finding as to insanity would be a burden resting on the Texas court, when the question was whether the owner of the Texas property occupied a status that would authorize the Texas court to assume control of the property. The adjudication of the Texas court as to minority, or as to insanity, would not be in the nature of a proceeding in personam, but would be a step in the determination of the question whether the property in Texas was subject to the jurisdiction and control of the court.

There is much argument in the briefs about whether there is or is not sufficient proof in the record of an adjudication of insanity in Missouri prior to the 1918 guardianship appointment by the Clay County Court. As we see it, it is not material here whether there was or was not such an adjudication in Missouri. A rule that would require the Texas court to refrain from assuming control of the property lying within its jurisdiction until a Missouri court had declared the property owner insane would impair, or could even defeat entirely, the exercise of jurisdiction by the Texas court. Missouri might

never take any action with respect to the question of Henderson's insanity, in which case, under the views entertained by the appellant, the result would be that Texas would be left powerless to exercise the exclusive jurisdiction which it has over property situated within its territorial limits.

Appellant suggests that Texas would have jurisdiction only to maintain an ancillary guardianship, following an insanity proceeding in Missouri. This contention is answered in Neal v. Bartleson, 65 Tex. 478, where it is said that "the exercise of the power to appoint here the qualified non-resident guardian is the exercise simply of the power of the court to appoint guardians of the estates of such persons."

■ Appellant also argues that Article 4123 did not before it was amended in 1921 provide for a determination of insanity in what we might term an ordinary guardianship proceeding. Since 1876 Article 4132 has authorized the appointment of a guardian of the estate of a nonresident minor or insane person. Even without that statute, under the principles announced in Neal v. Bartleson, 65 Tex. 478, cited supra, the court would have had jurisdiction to appoint the guardian. Authority to make the guardianship appointment would clearly imply authority to find the fact necessary to support jurisdiction of the county court of the estate in question, to-wit, that the nonresident owner was a minor or a person of unsound mind.

Appellant next argues that both guardianship appointments were invalid for lack of personal service on Hugh Henderson. The opinion in Redmon v. Leach, Tex.Civ. App., 130 S.W.2d 873, cited supra, so holds, and there is certain dicta in the opinion in Bearden v. Texas Co., Tex.Com.App., 60 S.W.2d 1031, which might indicate a rule that an insane person over 14 years of age must be served personally when application is made for appointment of a guardian. Redmon v. Leach involved an appointment of a guardian of a nonresident, but in Bearden v. Texas Co. the insane person resided in Texas. Art. 4274 provides:

"Each provision of this title relating to the guardianship of the persons and estates of minors shall apply to the guardianship of the persons and estates of persons of unsound mind, and habitual drunkards, in so far as the same are applicable."

Art. 4114 provides for issuance by the clerk of notice of an application for guardianship of a minor. Art. 4115 provides that the notice shall be posted for ten days. Art. 4116 provides that minors over fourteen years of age shall be personally served with citation. It is appellant's theory that Art. 4116, by reason of Art. 4274, is applicable to guardianship of insane persons, and that insane persons over fourteen years of age must be personally served with citation.

■ In the absence of a statute providing for nonresident notice on a nonresident minor or person of unsound mind, we do not see that proper notice could have been given under the statutes in force at the times of the appointments here involved, except by publication in a local newspaper in 1918, or by posting in 1939, unless the nonresident had been personally served within the borders of the state. "The life or force of a process in personam is limited to the territorial jurisdiction of the court that issued it, not beyond, and when a court or its officers seek to expand the reach of process beyond this, it is a nullity and judicial action in personam against a nonresident may not be predicated thereon". 42 Am.Jur., p. 43. "Personal service on a nonresident defendant, outside the jurisdiction of the court, does not suffice to give the court jurisdiction over his person. When the process of a state court crosses the state line, it loses its vitality as an instrument on which a personal judgment can be rendered against a nonresident." Id. Nonresident notice is in legal effect substituted or constructive service. Neither in 1918 nor in 1939 was there any statute in Texas authorizing nonresident notice in a guardianship proceeding. While Erwin v. Holliday, 131 Tex. 69, 112 S.W.2d 177, cited supra, did not involve a guardianship proceeding, it is authority for the proposition that nonresident notice cannot be employed as a method of service on a nonresident in the absence of a statute providing for its use in the particular proceeding.

The basic error in appellant's contentions, both as to the jurisdiction of the Texas court to appoint a guardian and as to the question of personal service on Hugh Henderson, is the failure to treat the guardianship as a proceeding in rem rather than as a proceeding in personam. The primary purpose of the guardianship proceeding was not to have the County Court of Clay County adjudge the status of the nonresident Hugh Henderson, but to have that court exercise control of property lying within its jurisdiction.

Appellant's brief contains a suggestion that the 1918 appointment is invalid for failure to contain an express adjudication that Henderson was insane. The application for guardianship avers that Hugh Henderson is a person of unsound mind, and the order appointing a guardian recites that application for appointment of guardian of Hugh Henderson, a person of unsound mind, came on to be heard, and orders, adjudges and decrees, to quote from the order, "that said M. L. Henderson be and is hereby appointed guardian of the estate of Hugh Henderson, lunatic * * *." Bearing in mind what is said above, we hold that the order of the court amounts to an express finding and adjudication by the court that Henderson was a person of unsound mind.

It is also contended that the two appointments are invalid because there was not a trial to a jury, and because no guardian ad litem was appointed by the court to represent Hugh Henderson. The authorities cited by appellant on the question of jury trial are not applicable to the proceedings now under review, and we find no authority to support the proposition that the orders were invalid for failure to appoint a guardian ad litem. Proceedings for the appointment of a guardian are not adversary in character. McKinley v. Salter, Tex.Civ.App., 136 S.W.2d 615, writ dismissed, correct judgment.

Appellant's first point of error reads as follows: "The oil and gas lease made to Shell Oil Company by M. L. Henderson as guardian, and the order of and proceedings in the County Court upon which it was based, are invalid and should be set aside, because the undisputed evidence and admissions of Shell show that such guardianship proceedings, though purporting to be in behalf of and for the benefit of Hugh Henderson, were actually conducted in behalf of Shell Oil Company, and that without disclosure to the County Court the attorney who represented the guardian and therefore the interests of Hugh Henderson in said proceeding was then and there a broker in the pay of Shell Oil Company, employed by it on a contingent basis to procure for it an oil and gas lease on Hugh Henderson's land and at the conclusion of the proceedings was paid a commission by Shell for procuring said lease as well as attorney's fees for conducting said proceedings, and the Court erred in failing and refusing to vacate and cancel said oil and gas lease and said order and proceedings upon which it was based."

The judgment appealed from upholds the guardianship proceedings. Disputed fact questions must be resolved in favor of appellees. Bearing this in mind, it appears from the evidence that in 1939 Shell Oil Company made some seismographic exploration in the area where Hugh Henderson's land was located. What information such exploration disclosed is not shown by the record, nor was it disclosed to the guardian nor to the county court when application was made to lease the land to Shell. Shell representatives got in touch with Mr. Frank Bunting, an attorney in Clay County who was related by marriage to the members of the Henderson family. They, together with Hugh Henderson, owned a considerable amount of land in the area. Shell engaged Mr. Bunting to obtain leases on such land, if it could be done, and authorized him to pay $5 per acre for the leases. Shell also agreed to pay him a brokerage fee of 50 cents per acre on all leases which he might obtain. Mr. Bunting approached M. L. Henderson and other members of the family, and told them of the offer made by Shell for leases. Leases were obtained on lands belonging to other members of the family, and the guardian agreed to lease the ward's land to Shell, subject to ap-

proval of the county court. When Mr. Bunting first approached the guardian, and others of his relatives as well, he advised them that he would receive a brokerage fee from Shell on all leases that he might obtain. Discussion arose between the guardian and Mr. Bunting concerning the handling of the proceedings in the probate court, and the guardian suggested that Mr. Bunting act as attorney for the guardian in presenting the matter to the court. Mr. Bunting again pointed out that he expected to receive a brokerage fee from Shell, but nevertheless it was agreed between Mr. Bunting and the guardian that the former should act as attorney in presenting the lease matter to the county court. It was also agreed that Shell would pay all the costs of the probate proceeding, including the attorney's fee. Pursuant to the arrangement made, Mr. Bunting represented the guardian in the probate court proceedings, and was paid an attorney's fee for such services by Shell, and was also paid the brokerage fee by Shell which had theretofore been agreed upon. The various applications, orders, etc., used in the probate proceedings were first prepared by Shell attorneys, and then sent to Mr. Bunting, who made changes in some of the papers, but not in others.

Appellant contends that the 1939 order of appointment, and especially the lease to Shell, must be stricken down because Mr. Bunting, while acting in the employ of Shell, also acted as attorney for the guardian in the probate proceedings. It is argued that Mr. Bunting could not lawfully represent both buyer and seller, especially in a case where the seller was a guardian who first had to apply to the court for authority to make the sale. It is argued that the evidence shows without dispute that the guardianship proceedings were conducted as an enterprise of Shell Oil Company, and for its benefit, and not for the benefit of the ward's estate. It is contended that the law provides that the guardian may have an attorney, and that if he does, the attorney must not represent conflicting interests. While a great many decisions and statements of text-writers are cited by appellant, none of them is in point with respect to the facts of this case,

except in so far as they declare general principles of law. Some of them involve claims of attorneys for fees, where they represented conflicting interests without notice to the parties of such conflict. Others involve the authority of attorneys to bind clients in such situations. Many of the cases involve the general rule that sales will not be upheld where the guardian, trustee, or other representative purchases property of the estate in his charge. Other cases involve sales by fiduciary representatives to wives, law partners, or business associates of the fiduciary. In the kinds of cases just mentioned, and in many other kinds of cases, courts have refused to uphold sales, or to enforce contracts or other rights, on the ground of public policy. In a suit on a gambling contract, for instance, while a court may say that there is no contract, the real basis for refusal to enforce the contract is that the court believes that it would be unsound public policy to enforce it. In the cases of purchases of property by representatives from estates in their charge, the courts in the most positive language have condemned such purchases, and have employed even fictional devices to annul them. They do so on the ground that it is against public policy to permit such purchases, or sales, and that inquiry will not be made into the question of the fairness of the sale or the adequacy of the purchase price. While the rules in this respect are so well known that it is not necessary to cite the host of decisions declaring them, an outstanding opinion is that of the Supreme Court of the United States, in Michoud v. Girod, 4 How. 503, 11 L.Ed. 1076. Our problem is to determine whether such rules are applicable to the facts before us. If the rules applicable to purchases by fiduciaries from the estates in their care, or to sales by fiduciaries to wives, law partners, and business associates, govern the case before us, then we will not consider the adequacy of the price, nor will we inquire whether the sale was advantageous to the estate or not. Nor would it be material whether the question was raised on direct appeal from the county court, or by certiorari. This is true, because the courts will go far in striking down sales made under such cir-

cumstances. But as we analyze the facts here presented, the case does not come within those rules.

The lease was not made to a guardian or to one so closely connected with him that the conveyance will be held invalid under the rules just discussed. Nor is it a case where the guardian received a fee or other compensation from the purchaser for making the sale. The courts in those cases will hasten to declare the sale invalid unless the rights of innocent purchasers are involved. There is no claim that Mr. Bunting made any misrepresentation, of fact or of law, to the guardian or to the county court in the purchase of the lease or in the presentation of the matter to the court. There is no claim that the written lease, or any of the court proceedings, fail to contain the agreements made between the guardian and the lessee. There is no suggestion, either by way of proof or by contention by appellant, that the application to make the lease, the order confirming it, or the lease itself, would have contained different language if prepared by any other attorney. Mr. Bunting's role as attorney for the guardian, under the facts shown by the record, cannot be so magnified as to bring the case within the classes of cases above enumerated. Had the guardian been paid a brokerage fee by Shell for obtaining the lease, we would have a completely different case, and one which any court would quickly and sternly decide. But that did not happen.

Appellant cites cases where there was a conflict of interests between a minor and the person representing him as next friend in a suit, but those cases are not like the one before us. Nor is Slay v. Burnett Trust, 143 Tex. 621, 187 S.W.2d 377, in point on the facts. In that case the conduct charged as fraudulent was that of the trustee himself and his law partner, which brought the case within the rules above discussed. Many statements can be found in opinions of appellate courts to the general effect that it is improper for an attorney to represent conflicting interests, but those statements must in each instance be read in the light of the facts involved in the particular case in order to arrive at a true interpretation of them.

In certain kinds of cases, as in sales of estate property to a fiduciary, the court may declare the sale improper, and set it aside, without respect to the question of damage to the estate. In other kinds of cases, as where fraudulent misrepresentations are made by the purchaser to the guardian, the court might declare that fraud had been committed, and yet decline to set the sale aside in the absence of a showing of damage to the estate. The distinction in the two kinds of cases, and in the attitudes of the courts toward them, lies in the fact that in the first the court strikes down the sale as a matter of public policy, and by way of issuing warning to all fiduciaries that they must not trade and traffic in the property of the trust estate, while in the other the object of the court is to afford redress for a wrong committed.

Appellant argues that full disclosure was not made to the guardian and to the court about the seismographic exploration which Shell had made, but we know of no rule of law requiring the purchaser of oil leases to disclose to the seller information that the purchaser may have concerning the land which the seller may not have, in the absence of a fiduciary or confidential relationship between the buyer and the seller. It is argued that it was improper not to disclose to the county court the fact that the guardian's attorney had a personal interest in the transaction by way of a brokerage fee to be paid him by the Shell. This contention has caused us some concern, but we have concluded that the most effect which could be given it would be to say that it would be ground for setting aside the sale if it were reasonably shown that such nondisclosure caused the court to approve a sale at an inadequate price. It would not bring the case within the rules declaring sales invalid for reasons of public policy without regard to the question of damage.

Appellant attacks the conveyance of half the minerals made by the guardian on the theory that (1) the sale was made solely under Article 4195a, which statute does not authorize the sale of minerals, royalties, the right to make future leases, and future bonuses, (2) no facts existed authorizing the

sale under Article 4195a, and (3) the sale was made without any authority of law.

 Article 4195a, Vern.Tex.CivSt., provides that whenever the estate of a ward consists in part of real estate, and any part or parcel of such real estate produces no revenue or does not produce sufficient revenue to make a fair return upon the value of such part of parcel of real estate, and the guardian does not deem it advisable or advantageous to improve such part or parcel of real estate, and believes that the sale thereof and investment of the money derived therefrom would be to the best interest of said estate under all the circumstances, he may apply to sell it and the court may order it sold. No oil had been discovered on or produced from this land at the time of the sale of half the minerals. The guardian had from time to time received small amounts of money from grass leases, and from sale of oil and gas leases (which had expired prior to the time the Shell lease was made). He received $2,200 from the sale of the lease to the Shell. It was shortly after this that he made the mineral conveyance to the Shell. The guardian's application to sell half the mineral interest in the land alleges facts substantially the same as those set out in Article 4195a, and in ordering the sale the county court found that such facts existed. The district court obviously found the same facts, in refusing to set aside the probate order. It cannot be said that there is no evidence to support the finding thus necessarily to be implied.

Appellant argues, but cites no authority in support of the argument, that Article 4195a "does not authorize the sale of minerals, royalties, the right to make future oil and gas leases and future leases." Article 4195a authorizes the sale of unproductive "real estate." This clearly warrants a sale of the minerals or an interest therein separate and apart from the surface. See Avis v. First Nat. Bank, 141 Tex. 489, 174 S.W.2d 255, and authorities therein cited.

All that is said above concerning Mr. Bunting's connection with the making of the lease is applicable to the sale of the mineral interest.

Many other questions are discussed in the briefs and written arguments of the parties, comprising more than six hundred pages, but we have discussed the questions which we consider necessary to a proper disposition of the appeal.

Finding no error, we affirm the judgment of the trial court.