# IN THE SUPREME COURT OF TEXAS

═══════════

No. 17-0634

═══════════

IN RE VERNA FRANCIS COLEY THETFORD, RELATOR

═══════════

ON PETITION FOR WRIT OF MANDAMUS

═══════════

**Argued October 10, 2018**

JUSTICE BROWN, joined by JUSTICE DEVINE, JUSTICE BLACKLOCK, and JUSTICE BUSBY, dissenting.

A trial judge's discretion in guardianship proceedings should be wide and deep. As the Court correctly observes, so much turns on what the judge can see and hear—what a cold record does not reveal. But as guardianship proceedings become more abundant as our population ages, some situations call for hard-and-fast rules. This is one: Alfred Allen should not be allowed to represent Verna Thetford's niece—his own legal assistant—in a guardianship proceeding against Thetford, a woman he insists to this Court is still his client.

I propose a simple rule: "A lawyer with a disabled client should not attempt to represent a third party petitioning for a guardianship over the lawyer's client." It's a black-and-white rule. Easy to follow. Rooted in common sense. It is the model rule promulgated by the American Bar Association's ethics committee. *See* ABA Comm'n on Ethics & Prof'l Responsibility, Formal Op. 96-404 (1996). The ABA's model rule, of course, is not binding on us. But we should adopt it, or something like it, as eleven states already have.

We need not impugn Allen's motives to conclude his representation in this matter is inherently conflicted. I believe the disciplinary rules we have in place support this conclusion. But even if they don't, those rules, like the ABA's model rules, are just guidelines. We should not surrender to an interpretation of those rules that stymies their purpose. This case presents an obvious conflict that we have the authority to proscribe. Because the Court declines to take this reasonable step, I respectfully dissent.

## I

In 2012, Allen represented Verna Thetford in lending $350,000 to her niece, Jamie Rogers. Allen prepared the note and the deed of trust, which named Allen as trustee. Three years later, Allen prepared Thetford's will and a power of attorney. The will named Rogers as a beneficiary, and the power of attorney named her as Thetford's attorney in fact. The power of attorney also designated Rogers as Thetford's preferred guardian "if the need for a guardian later arises."

Rogers and Allen were no strangers—Rogers was Allen's longtime legal assistant. Although Rogers was not working for Allen when he drafted the power of attorney, she returned soon after. Indeed, Rogers was Allen's legal assistant when he initiated this guardianship proceeding against Thetford.

After Thetford was hospitalized in early 2017, Rogers arranged for her to be placed in an assisted-living facility. On March 15, Rogers defaulted on the $350,000 note. Shortly thereafter, on March 27, Thetford—represented by a lawyer other than Allen—signed a revocation of Rogers's power of attorney. Two days later, her longtime physician diagnosed her with moderate dementia of increasing severity. He also noted deficits in her short-term memory and that she lacked the ability to make many important decisions.

On April 10, Allen filed an application to have Rogers appointed as Thetford's guardian and for the creation of a management trust. It is undisputed that Rogers was still indebted to Thetford when the application was filed. We can imply from these facts that Allen approached Rogers about the guardianship application, or vice versa,[1] while (1) Rogers was past due on the note owed to Thetford, and (2) Allen was the named trustee on that same note. There is no evidence Allen ever advised Thetford concerning Rogers's default.

I acknowledge that a potential ward's indebtedness does not necessarily disqualify her from serving as guardian. *See In re Guardianship of Miller*, 299 S.W.3d 179, 189 (Tex. App.—Dallas 2009, no pet.) ("[W]e decline to conclude that evidence of a debt alone automatically rises to the level of an adverse interest sufficient to divest a person of standing [to pursue a guardianship application]."). But this case isn't about Rogers. It is about Allen, his representation of Thetford, and his representation of Rogers in a guardianship proceeding against Thetford. And Allen's decision here is troubling. Allen filed a guardianship application against a lender on a note for which he was the trustee. And he did so representing the note's defaulting debtor who also happened to be his own employee. Even if such an arrangement is technically permissible, it's not a good look for anyone involved or for the legal profession at large. Surely Rogers could have found another attorney to pursue the guardianship application. And surely Allen should have suggested she do so.

---

[1] It is unclear from the record who first had the idea to initiate the guardianship. However, Rogers's Response Brief claims that "Allen initiated the underlying guardianship proceeding." Response to the Brief on the Merits at 12, *In re Thetford*, No. 17-0634 (Tex. Mar. 13, 2018).

## II

There is some confusion about whether Thetford is Allen's current or former client and which disciplinary rule therefore applies. Because the rules' standards are materially similar, the Court does not definitively hold whether Thetford is Allen's current or former client. But Thetford argues for the application of Rule 1.06, which concerns conflicts of interest arising from concurrent representations. *See* Tex. Disciplinary Rules Prof'l Conduct R. 1.06(b)(1) ("[A] lawyer shall not represent a person if the representation of that person involves a substantially related matter in which that person's interests are materially and directly adverse to the interests of another client of the lawyer . . . .") (internal punctuation omitted).

Thetford maintains Allen is still her attorney.[2] And Allen seems to agree, stating at oral argument to this Court that "I really do view it that I'm representing Mrs. Thetford."[3] If both Allen and Thetford believe the attorney-client relationship still exists, we should too. It does not matter, and we need not decide, whether a formal attorney-client relationship still exists. What matters here is that the parties believe it does, and so Allen must act accordingly. I would therefore apply Rule 1.06. While I agree with the Court that the standards for substantial relation and adversity are

---

[2] The disciplinary rules do not restrict a client's ability to unilaterally terminate the attorney-client relationship. Tex. Disciplinary Rules Prof'l Conduct R. 1.15(a)(3) & cmt. 4 ("A client has the power to discharge a lawyer at any time, with or without cause . . . ."). Despite this ease of termination, Thetford has continually argued to this Court that Rule 1.06—regarding current client conflict of interest—applies. The Court points to various passages in Thetford's briefing suggesting Thetford is a former client. And indeed, Thetford makes the argument that Allen additionally violated Rule 1.09, which applies to former clients. Thetford's decision to argue both rules notwithstanding, her chief argument on appeal to this Court—indeed, the first argument she makes in her brief on the merits—is that Rule 1.06 prohibits Allen's representation of Rogers. But even if Thetford clearly disclaimed the attorney-client relationship, I would nonetheless find the ABA's guidance applicable and persuasive.

[3] Transcript of Oral Argument, *In re Thetford*, No. 17-0634, 2018 WL 5017939 (Tex. argued Oct. 10, 2018), available at http://search.txcourts.gov/Case.aspx?cn=17-0634&coa=cossup.

largely the same under both rules, Rule 1.06 concerns the duties owed to a *current* client—a circumstance the ABA and eleven other states have spoken to directly.

The ABA Ethics Committee, in interpreting its Model Rule 1.14, concluded that "a lawyer with a disabled client should not attempt to represent a third party petitioning for a guardianship over the lawyer's client." ABA Comm'n on Ethics & Prof'l Responsibility, Formal Op. 96-404 (1996). The committee acknowledged that "it is not uncommon for the lawyer to be approached by a family member or other third party with a request that the lawyer represent that third party in pursuing the petition." *Id.* But the committee squarely rejected representation in this scenario:

> However, nothing in the rule suggests that the lawyer may represent a third party in taking such action, and after considerable analysis, the Committee concludes that a lawyer with a disabled client should not attempt to represent a third party petitioning for a guardianship over the lawyer's client.
> . . .
> In particular, it does not authorize a lawyer to represent a third party in seeking to have a court appoint a guardian for his client. Such a representation would necessarily have to be regarded as "adverse" to the client and prohibited by Rule 1.7(a), even if the lawyer sincerely and reasonably believes that such representation would be in the client's best interests . . . . In short, if the lawyer decides to file a guardianship petition, it must be on his own authority under Rule 1.14 and not on behalf of a third party, however well-intentioned.

*Id.* ABA opinions and the policies embraced in other jurisdictions are not binding on the Court. Nevertheless, it is notable that at least eleven other states have either adopted the ABA's position or independently reached the same conclusion—that a lawyer should not represent a third party's guardianship proceeding against a client.[4] This trend deserves the Court's attention.

---

[4] **Colo**. Bar Ass'n, Formal Ethics Op. 126 (May 6, 2015) ("[T]he lawyer should not represent a third party petitioning for the appointment of a guardian for the lawyer's client."); *Att'y Grievance Comm'n of* **Md** *v. Framm*, 449 Md. 620, 656 (2016) (quoting the ABA's 96-404 Opinion in holding the lawyer violated Maryland's Ethical Code of Conduct); **Mass**. Bar Ass'n Comm. on Prof'l Ethics, Op. 05-05 (May 2005) ("It would be inappropriate for a lawyer for a long-time client to represent a son seeking to have a guardian appointed for the client when it seems likely that

**III**

In its analysis, the Court instead leans heavily upon our disciplinary rules. But we have said that these rules "do not determine whether counsel is disqualified," but rather "provide guidelines and suggest the relevant considerations." *In re EPIC Holdings, Inc.*, 985 S.W.2d 41, 48 (Tex. 1998) (citing *Nat'l Med. Enters., Inc. v. Godbey*, 924 S.W.2d 123, 132 (Tex. 1996)). I'm afraid the Court has allowed a crabbed reading of the rules to replace a thorough examination of Allen's decision to represent Rogers.

The Court concludes that the guardianship proceeding is not substantially related to Allen's representation of Thetford—namely, his assistance in drafting and executing her estate-planning

---

the lawyer will be opposing the client's wishes and the lawyer would not be able to comply with the consent and reasonableness tests that would permit such representation. Moreover, the lawyer also ought not to represent the son if it seems likely that she will be a necessary witness in a guardianship proceeding."); State Bar of **Mich**., Ethics Op. RI-176 (1993) ( "A lawyer may not undertake representation of both a mother and daughter in proceedings to establish a guardianship for the mother when the lawyer knows the mother's and daughter's interests in establishing the guardianship are adverse."); *In re Wyatt's Case*, 159 **N.H.** 285, 302, 982 A.2d 396, 410 (2009) ("'[N]othing in the rule suggests that the lawyer may represent a third party in taking such action.' '[I]f the lawyer decides to file a guardianship petition, it must be on his own authority under Rule 1.14 and not on behalf of a third party, however well-intentioned.'") (quoting ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. No. 96–404 (1996) (internal citation omitted); **N.Y.** State Bar Ass'n, Comm. on Prof'l Ethics, Op. 746 (July 18, 2001) ("Even if the alleged incapacitated person was formerly a client but is no longer one, if he or she objects to the appointment of a guardian the lawyer may be barred by DR 5-108(A) from representing him- or herself (or anyone else) as petitioner, since the current representation would likely be adverse to a former client in a matter substantially related to the subject of the former representation. In that event, as attorney-in-fact, the lawyer should retain separate counsel. . . ."); *Dayton Bar Ass'n. v. Parisi*, 965 N.E.2d 268, 274 (**Ohio** 2012) ("We concur in this analysis and conclude that the guardianship proceeding that Parisi initiated on behalf of Demming's niece, no matter how well-intentioned, was necessarily adverse to Demming."); **S.C.** Bar Ethics Advisory Comm., Ethics Advisory Op. 05-11, 2005 WL 1704509 (July 15, 2005) ("If the attorney seeks the appointment of a guardian, this action must be on attorney's own authority under Rule 1.14 and not on behalf of a third party, which would be prohibited under Rule 1.7(a)."); *In re Discipline of Laprath*, 670 N.W.2d 41, 57–58 (**S.D.** 2003) (extensively quoting ABA's Model Rule 1.14); **Utah** State Bar, Ethics Advisory Op. Comm., Op. 08-02 (Mar. 11, 2008) ("[I]f a third party initiates the guardianship proceeding, the attorney should not represent the third party, nor should the attorney seek to be appointed guardian of a client with diminished capacity."); **Va.** State Bar, Va. Legal Ethics Op. 1769 (Feb. 10, 2003) ("Neither the attorney in this hypothetical, nor anyone in his office, may properly represent the daughter in petitioning for a guardian for her mother, also a client of this attorney's office. Such an action is by its very nature an adverse action with respect to the mother."); **Wash.** State Bar Ass'n, Advisory Op. 980 (1986) (discussing representation of wife in petition for guardianship of husband when lawyer previously represented both husband and wife). *See also* **Vt.** Bar Ass'n, Advisory Ethics Op. 2006-1 (favorably quoting ABA Formal Opinion 96-404 in deciding an issue of whether a lawyer may directly pursue a guardianship over a client).

6

documents.[5] The Court reasons that whatever confidences Thetford revealed to Allen in drafting her will are now "open knowledge" because the will and power of attorney were published at the guardianship proceeding. The Court then concludes that "[t]here can be no threat of disclosure of confidences that [Thetford] has already revealed to her adversary." *Ante* at ___. I agree that if the universe of confidences Thetford might have placed in Allen as her attorney could be reduced to the words on the pages of the documents she executed, there is nothing more Allen could divulge. But I do not take so limited a view of the attorney-client relationship, particularly when it involves end-of-life planning.

### *"Substantially related"*

The Disciplinary Rules do not define "substantially related." According to comment 4B to Rule 1.09, substantial relation "primarily involves situations where a lawyer could have acquired confidential information concerning a prior client that could be used either to that prior client's disadvantage or for the advantage of the lawyer's current client or some other person." Tex. Disciplinary Rules Prof'l Conduct R. 1.09 & cmt. 4B. We have clarified that a party seeking disqualification of counsel "must prove the existence of a prior attorney-client relationship in which the factual matters involved were so related to the facts in the pending litigation that it creates a genuine threat that confidences revealed to [] former counsel will be divulged to [a] present adversary." *NCNB Tex. Nat'l Bank v. Coker*, 765 S.W.2d 398, 400 (Tex. 1989). Meeting this burden requires "specific similarities capable of being recited in the disqualification order." *Id.* If this burden is met, the movant "is entitled to a conclusive presumption that confidences and

---

[5] The Court concludes Rogers's indebtedness to Thetford and her default on that debt is of no consequence because she paid the note off after the guardianship application was filed.

secrets were imparted to the former attorney." *Id.* (citing *P & M Elec. Co. v. Godard*, 478 S.W.2d 79, 80–81 (Tex. 1972) (orig. proceeding)). In doing so, the movant is not "forced to reveal the very confidences [she] wishes to protect." *Id.* Rather, by establishing a substantial relationship between the two representations, the moving party "establishes as a matter of law that an appearance of impropriety exists." *Id.*

The Court admits that "[e]state planning and guardianship are similar in that they are both end-of-life matters." *Ante* at \_\_\_. But it dismisses this notion as a "superficial comparison." *Ante* at \_\_\_. There must be something more here, the Court contends, some showing that confidences from the first representation could be used against Thetford in Allen's representation of Rogers. But as Thetford's will has been shared with everyone involved in the guardianship proceeding, the Court finds there's nothing left to be exploited.

This blunt analysis reduces the inquiry to a facial comparison of (a) the work product that resulted from Allen's representation of Thetford to (b) the nature of the proceeding in which he now represents Rogers. It is true that Allen's tangible work product resulting from his representation of Thetford is limited to a handful of estate-planning documents. But such a summary does not capture the entire character of an attorney's representation in estate-planning matters; our inquiry should be more nuanced.[6] *Coker* implores us to look at whether "the factual matters involved" in the prior representation are "related to the facts in the pending litigation." 765

---

[6] Two seemingly identical proceedings can be entirely unrelated in issue and fact, and yet two different causes of action can arise from near-identical facts. *See In re Hous. Cty. ex rel Session*, 515 S.W.3d 334, 343–44 (Tex. App.—Tyler 2015, orig. proceeding) (adopting a party's argument that "the protective order . . . and the termination case are 'substantially related' because R.G.'s family violence is an issue in both."); *Troutman v. Ramsay*, 960 S.W.2d 176, 178–79 (Tex. App.—Austin 1997, no pet.) (holding that a family's attorney could not represent the son in a property dispute because attorney had previously probated the mother's will); *Home Ins. Co. v. Marsh*, 790 S.W.2d 749, 754 (Tex. App.—El Paso 1990, no writ.) (holding that medical malpractice representation was substantially related to representing insurance company in conspiracy class action).

S.W.2d at 400. So rather than just looking at the end result of the representation, we should more closely examine the factual matters involved in that representation and how they might relate to a guardianship proceeding.

There are at least two common areas of concern that arise both in Allen's representation of Thetford and his representation of Rogers: Thetford's estate planning and her mental capacity. Before filing the application for guardianship on Rogers's behalf, Allen was intimately involved with Thetford's estate planning. Now, he represents a client who seeks to deprive Thetford of the ability to manage her own estate, even though the record indicates that Thetford prefers to exclude Rogers as a potential guardian. As for Thetford's mental capacity, Allen drafted the durable power of attorney that made Rogers Thetford's guardian and attorney in fact in case she ever became incapacitated. Now, Allen represents Rogers in arguing that Thetford's revocation of the power of attorney is actually evidence of her incapacity. My point is not to impugn Allen's motives; he may very well have Thetford's best interests at heart. Regardless, Thetford's preparations for her potential incapacity—with Allen's assistance—and Rogers's current attempts to prove Thetford's incapacity—also with Allen's assistance—are clearly, specifically, and substantially related.

This alone satisfies the rules' substantial-relation standard. But even if the Court has the better interpretation, I would have deeper concerns that our rules simply do not adequately address this situation. And if they don't, we should. Ultimately, the Court's tightfisted application of the substantial-relation test, even if correct, ignores the fact that, as Thetford's estate-planning lawyer, Allen could have gained significant insight into Thetford's mental capacity thanks to the sanctity of an attorney-client relationship forged in the context of end-of-life planning.

9

In the course of his representation of Rogers in the guardianship proceeding, Allen will seek to establish Thetford is incapable of managing her affairs and caring for herself. *See* Tex. Est. Code § 1101.101(a)(1)(A)–(E). The risk is not that he will accomplish this by divulging the contents of her will. The risk is that he will do so by drawing on his knowledge and experience of Thetford's mental capacity acquired through the span of their attorney-client relationship. We need look no further than the mere fact that Allen is representing Rogers in the guardianship proceeding to conclude that he believes Thetford's mental state is not what it was in 2012 when he assisted her in executing a will. *See id.* § 251.001 ("[A] person of sound mind has the right and power to make a will."). Allen is now in a privileged position to use his then-and-now experiences—created in an attorney-client relationship—to help Rogers make her case.

Importantly, this risk runs deeper than Allen's subjective observations of Thetford's demeanor and mental processes. In the confines of their privileged relationship, there is no telling what information Thetford might have candidly shared concerning her mental state that informed her estate-planning decisions. Because Allen was assisting in her end-of-life planning, Thetford had every reason to speak openly with her attorney about issues she might otherwise conceal.

The Court believes the physical documents of Allen and Thetford's attorney-client relationship resolve this question. I believe the case should be resolved by looking at the relationship itself. Estate planning involves more than writing words on a page, particularly for elderly clients. It involves the sharing of confidences, candid desires, and deep-seated fears. Clients might articulate rational concerns both poignant and personal in hopes that their attorney will help them plan accordingly. The most intimate confidences a client might convey to her attorney is her awareness that her mental capacity is beginning to slip and her request that an attorney help her

10

plan for a future in which she can no longer care for herself. And that attorney will be in an advantaged position to later evaluate the extent to which his client's mental capacity has indeed degraded. That information in the hands of a new client seeking a guardianship over the former client is an unfair advantage derived from a relationship of trust and confidence.

Again, I do not suggest Allen is maliciously working against Thetford's best interests. Thetford might indeed need a guardian, and Allen might know that as well as anyone could. But the job should fall to someone other than Allen.

### *"Adversity"*

Like Rule 1.09, Rule 1.06 also prohibits a lawyer from representing a person "if the representation of that person involves a . . . matter in which that person's interests are materially and directly adverse to the interests of another client." Tex. Disciplinary Rules Prof'l Conduct R. 1.06(b)(1). We have broadly defined adversity as "a product of the likelihood of the risk [that the pending litigation poses to the person's interests] and the seriousness of its consequences." *See Nat'l Med. Enters., Inc. v. Godbey*, 924 S.W.2d 123, 132 (Tex. 1996). So even if the representations are substantially related, no conflict exists if they are not adverse. Unlike the concurring justices, I believe this element is also met.

After labeling guardianship proceedings as not inherently adversarial, the concurring justices craft a definition for adversity in the guardianship context so narrow I am unsure how it could ever be satisfied. Despite their admission that a guardianship proceeding "strips the ward of fundamental rights," the concurring justices argue that a proceeding is adverse only if the guardianship applicant's interests are "adverse to the proposed ward's objectives or interests as the proposed ward would have defined them when she had capacity." *Ante* at ___. If there is no direct

11

evidence of such pre-incapacity interests, "adversity exists when the applicant's interests would not promote and protect the proposed ward's well-being." *Ante* at ___. This proposed standard is based on an unpublished court-of-appeals opinion interpreting a now-repealed statute.[7] *See ante* at n.44. The concurring justices then look at Thetford's pre-incapacity interests. Because Thetford once gave Rogers the power of attorney and Rogers has unsurprisingly never sought to undermine her aunt's "well-being," they argue that Rogers and Thetford are not adverse. The concurrence then dismisses Thetford's opposition to the guardianship and concludes dismissively that "[p]roposed wards often believe, mistakenly, that they do not need a guardian." *Ante* at ____.

I agree that not all guardianship proceedings are inherently adversarial.[8] But a guardianship proceeding in which the proposed ward contests the guardianship *is* inherently adversarial. And even if I agreed that this guardianship proceeding is not inherently adversarial, I could not embrace the adversity test proposed in the concurrence.

My rationale for concluding that a guardianship proceeding contested by the proposed ward is inherently adversarial is simple: Thetford wants to retain her most basic personal rights and freedoms, but Rogers wants those rights transferred to herself. If Rogers succeeds in becoming

---

[7] No. 14-99-00619-CV, 2001 WL 40337, at *4 (Tex. App.—Houston [14th Dist.] Jan. 18, 2001, no pet.) (not designated for publication). *Betts* was interpreting a statute that the legislature repealed in 2011. Act of May 20, 1999, 76th Leg., R.S., ch. 829, § 4, sec. 2(a)–(b), 1999 TEX. GEN. LAWS 3461, *repealed by* Act of May 19, 2011, 82d Leg., R.S., ch. 823, § 3.02(a), 2011 TEX. GEN. LAWS 1901, 2094. Furthermore, *Betts* was solely about whether a party had standing in a guardianship proceeding, not about attorney disqualification. 2001 WL 40337, at *3 ("The issue [is] whether a party has standing to participate in a guardianship proceeding . . . .").

[8] The concurring justices cite three cases in support of the proposition that Thetford's guardianship proceeding is not inherently adversarial: (1) *Franks v. Roades*, 310 S.W.3d 615, 627 (Tex. App.—Corpus Christi 2010, no pet.); (2) *Henderson v. Shell Oil Co.*, 202 S.W.2d 492, 497 (Tex. Civ. App.—Fort Worth 1947), *aff'd*, 208 S.W.2d 863 (Tex. 1948); and (3) *McKinley v. Salter*, 136 S.W.2d 615, 624 (Tex. Civ. App.—El Paso 1939, writ dism'd judgm't cor.), *appeal dism'd*, 312 U.S. 659 (1941). *Ante* at n.37. These cases state the basic proposition that guardianships are not inherently adversarial. I do not disagree—not all are. They do not, however, speak to whether a guardianship in which the *proposed ward* opposes the guardianship is inherently adversarial. I believe it is.

12

Thetford's permanent guardian, she is "entitled to take charge of the person of the ward," including "the right to have physical possession of the ward and to establish the ward's legal domicile," "the power to consent to medical, psychiatric, and surgical treatment," and "on application to and order of the court, . . . direct that the income of the ward . . . be paid directly to [a] trust." *See* TEX. EST. CODE § 1151.051(a), (c).

This transfer of personal sovereignty is, of course, oftentimes necessary. But whether the guardianship proceeding is adverse for disqualification purposes should not turn on whether the guardianship is ultimately warranted. A proposed ward might protest guardianship because she is in fact of sound mind. Or she might protest because she is not. Neither changes the fact that she is opposed to being stripped of her freedom to make decisions for herself. It is Thetford's opposition to a proposed loss of her personal freedom that makes her adverse to the party who seeks to take it. Her mental state—which cannot be legally determined until well after the disqualification ship has sailed—simply is not relevant to determining adversity. Only Thetford's stated desires and intentions matter. The concurring justices' suggestion that many proposed wards simply do not know what's best for them, while sometimes true, creates a cynical presumption in favor of proposed guardians. No doubt the vast majority act out of genuine concern for the proposed ward. But the deference the concurring justices afford the proposed guardian is too generous, especially in light of the seriousness of the issues in dispute and the most basic individual freedoms that are at stake. Of sound mind or not, a person who wishes to remain free is adverse to anyone who would take that freedom away.

Furthermore, even if I agreed that Thetford's guardianship proceeding is not inherently adversarial, I could not agree that the only way to demonstrate adversity is to show either pre-

13

incapacity adversity or that Rogers's interests are adverse to the promotion and protection of Thetford's well-being. Only if proposed wards have the legal foresight to raise adversity concerns before becoming incapacitated would this proposed standard protect wards from conflicted lawyers. As for the "well-being" secondary standard, guardianship proceedings are *always* premised on the proposed ward's best interests, and it is difficult to imagine a scenario in which the proposed guardian's ill will is so blatant as to be adverse to the proposed ward's very well being. *See Well-being*, NEW OXFORD AM. DICTIONARY (3d ed. 2010) ("[T]he state of being comfortable, healthy, or happy."). Our enduring standard for adversity—focusing on the "likelihood of the risk and the seriousness of its consequences"—is too flexible to be applied so miserly here. *See Nat'l Med. Enters., Inc. v. Godbey*, 924 S.W.2d 123, 132 (Tex. 1996).

I can only read the concurring justices' proposed adversity standard as requiring a showing that either the proposed ward had unrealistic foresight in raising adversity concerns or the proposed guardian has animus toward the proposed ward. It goes without saying that this standard would be nearly impossible to meet. Furthermore, the Estates Code already denies standing to bring a guardianship application if the proposed guardian "has an *interest* that is adverse to a proposed ward or incapacitated person." *See* TEX. EST. CODE § 1055.001(b) (emphasis added). This standard is lower than the disqualification standard enunciated by the concurrence—a proposed ward might have an *interest* adverse to the proposed guardian without being adverse to the proposed ward's *well-being*. Such is true for the example cited by the concurring justices as an adverse guardianship proceeding. The concurrence supposes that "had [Rogers] continued to be indebted to the Thetfords throughout the proceeding, her pecuniary interests would clearly be adverse to [Thetford]'s." *Ante* at ___. True, but this would not satisfy the concurring justices' well-being

14

standard. We have no reason to believe Rogers is adverse to Thetford's well-being even if she were still indebted to her. As for the pre-incapacity deadline to identify adversity, this proposed standard dangerously ignores the possibility that a legitimate concern about a lawyer's behavior may be raised after a proposed ward becomes incapacitated. We are left with unanswered questions: How would this standard protect our incapacitated population from conflicted lawyers that appear *after* incapacity? Next, how does the concurring justices' own hypothetical finding of adversity satisfy their own well-being test? And finally, if there is no direct evidence of the proposed ward's pre-incapacity interests, how could the concurrence's proposed well-being standard *ever* be met if the Estates Code already denies standing to guardianship applicants based on a lower standard? The concurring justices' well-being test for adversity seems unworkable to me.

* * *

For these reasons, I respectfully dissent. Alfred Allen may be a conscientious attorney with Verna Thetford's best interests at heart. But our disciplinary rules impose limits on an attorney's ability to represent a third party in a guardianship proceeding against a current or former client. I would take the parties at their word: Allen is Thetford's lawyer. Accordingly, I would apply Disciplinary Rule 1.06 and follow the guidance of the ABA Ethics Committee and at least eleven other states on this precise issue. Even if Allen is no longer Thetford's attorney, I would nonetheless hold that Disciplinary Rule 1.09 supports disqualification because Rogers's guardianship proceeding is adverse to Thetford and the proceeding is substantially related to Allen's prior representation of Thetford. The trial court exceeded its discretion when it denied Thetford's motion to disqualify.

15

_____
Jeffrey V. Brown
Justice

OPINION DELIVERED: May 24, 2019